(No. 12616.—Reversed and remanded.)

HORACE B. HARRIS, Admr., Appellant, vs. CHARLES W. FLACK et al. Appellees.

*Opinion filed June 18, 1919—Rehearing denied October 9, 1919.*

1. CLOUD ON TITLE—*equity appointing trustee for sale of real estate has jurisdiction to remove cloud.* A complainant in a bill for the appointment of a trustee, with power and direction to sell real estate under the terms of a will, may secure a decree removing a cloud upon the title to the real estate, as the power to decree the sale carries with it the power to provide that a good title shall be had in the purchaser.

2. DEEDS—*definition of duress.* Duress is a condition which exists where one by the unlawful act of another is induced to make a contract or to perform or forego some act under circumstances which deprive him of the exercise of free will.

3. SAME—*mere annoyance will not constitute duress.* Mere annoyance or vexation will not constitute duress, but there must be such compulsion affecting the mind as shows that the execution of the contract or other instrument is not the voluntary act of the maker.

4. SAME—*trust deed is not ratified when duress under which it was executed continues to operate.* While a deed obtained under duress may be ratified after the coercing influence has ceased to operate, yet where it is evident that a trust deed was obtained by a threat of forcing the grantor into court through conservatorship proceedings, an alleged ratification of said deed by the grantor while still under the same fear is of no effect.

APPEAL from the Circuit Court of Fulton county; the Hon. GEORGE W. THOMPSON, Judge, presiding.

MILLARD R. POWERS, for appellant.

GUMBART & GRIGSBY, CHARLES WOLFF, and CHIPERFIELD & CHIPERFIELD, for appellees.

Mr. JUSTICE STONE delivered the opinion of the court:

This is an appeal from a decree of the circuit court of Fulton county denying that portion of the prayer of complainant's bill asking for the removal of a certain trust deed

as a cloud upon the title to lands described in the bill.   The
relief sought by the bill is the appointment of a trustee to
sell real estate in accordance with the terms and provisions
of the last will and testament of Mary M. Harris, deceased,
and to remove as a cloud on the title to lands described in
the bill of complaint a certain trust deed executed and de-
livered by Mrs. Harris, on the ground that said instrument
was executed under duress, undue influence and fraudulent
representations, and on the further ground that the trust
deed, if voluntary, constitutes and is a testamentary instru-
ment not executed and witnessed as required by the stat-
ute on wills.   The decree appointed a trustee with power to
sell certain real estate, but the chancellor held the complain-
ant not entitled to the relief sought as to 240 acres of said
land, which 240 acres constitute the land in question here.
No cross-errors are assigned to this decree.

Charles W. Flack and John C. Lawyer were made par-
ties defendant, for the reason that at the time the bill was
filed they were claiming some right to the lands by reason
of certain contracts which they had with the heirs of Mary
M. Harris and by reason of a certain deed from John S.
Warner and wife, under which they were claiming a one-
seventh interest in the lands in question.   The contracts
were by this court held void as contrary to good morals
and public policy.   (*Flack* v. *Warner*, 278 Ill. 368.)   The
claim of the defendants Flack and Lawyer, therefore, are
based on the warranty deed.

Mary M. Harris died September 7, 1915, leaving a last
will and testament dated October 5, 1910, and a codicil
thereto under date of December 28, 1910, both duly proven
and admitted to probate by the county court of Fulton
county, of which county Mrs. Harris was a resident at the
time of her death.   The will and codicil, after providing
for the payment of debts, give and devise all her real and
personal estate in trust to James C. Hammond, the executor
therein named, and in case of his not acting as such execu-

tor then to the executor who qualifies, with power to sell and dispose of the same at public or private sale upon such terms and in such manner as he may consider will yield the largest amount, and further give, devise and bequeath certain specified sums of money to be paid to the legatees therein named. Hammond, the executor nominated in the will, refused to act, and the complainant, Horace B. Harris, who had acted as conservator for Mrs. Harris from 1913 to her death, was appointed administrator with will annexed.

The assets of the estate consist of certain mortgage loans, accounts, personal property, money, and three pieces of real estate described in the bill of complaint. The title to the real estate in question was of record in the name of Mary M. Harris at the time of her death, free and clear of all incumbrance, except as the title is affected by a certain trust deed executed, acknowledged and delivered by Mrs. Harris on November 25, 1910, and recorded March 1, 1911, which provides, in substance, that the grantor, Mary M. Harris, widow of Jonas R. Harris, deceased, "for and in consideration of one dollar and other good and valuable consideration to her paid, does hereby assign, transfer, set over, demise, alien and convey to James C. Hammond, of the same township, county and State, * * * all her right, title and interest in and to all of the real estate and personal property, of every kind and nature, that she has acquired and will become entitled to through the said Jonas R. Harris by reason of his death, as his widow and as one of his heirs," etc. The real estate therein described is all the real estate owned by Jonas R. Harris, her husband, at the time of his death, amounting to 680 acres, "to have and to hold the same, however, in trust for the following purposes." The instrument then sets out said purposes, to the effect that the trustee shall take possession and charge of all the property therein described except the household furniture, and shall manage the same for the benefit of Mrs. Harris during her lifetime, she to receive the profits thereof,

"and at her death said property to go as hereinafter provided." After providing for the making of repairs, payment of taxes, etc., by the trustee, together with his fees, and that Mrs. Harris should have the privilege of having a home in the village of Table Grove, Illinois, or elsewhere, and after providing for certain funds for her use for religious, educational and charitable purposes, the instrument provides that on the death of Mrs. Harris the trustee or his successor in trust shall by proper deeds convey certain lands not here involved. Said instrument, after providing for the division of her property, upon her death, among her different relatives, provides as follows: "Upon the death of the said Mary M. Harris this trust shall be fully executed and the *cestuis que trust* shall thereupon be entitled to the property in the proportion herein before provided, and the trustee shall thereupon distribute the personal property among them, and they shall have the right to take possession of the real estate above described."

This is the third time that the subject matter of this controversy has come to this court. The principal question still remaining in the matter is whether or not the trust deed of November 25, 1910, is a valid deed. If it is, the property in question here was transferred thereby to the trustee for distribution. If the deed is not valid the property passed under the will.

It is contended by appellees that even though the trust deed were invalid appellant could not, in a bill for the appointment of a trustee with power and direction to sell the real estate, secure a decree removing a cloud upon the title of the same. With this contention we cannot agree. The court had jurisdiction of the parties and of the subject matter and had power to decree the appointment of a trustee and direct the sale of the property. As the power to decree such sale carries with it the power to provide that a good title shall be had in the purchaser thereof, it follows the court had jurisdiction to remove a cloud on such title.

289 — 15

Mary M. Harris became seized in fee of the lands herein involved, described as the south half of the northwest quarter and the southwest quarter of section 36, town 5, north, range 1, west of the fourth principal meridian, in McDonough county, by virtue of a decree of the circuit court of said county in partition confirming the report of commissioners appointed in said proceedings, which report sets over the real estate to her as her share under her rights as set out in the partition proceedings. This decree was entered February 16, 1911, nearly three months after the trust deed was executed. There is nothing in the record tending to indicate that the existence of the trust deed was disclosed in the partition proceedings or that the trustee therein named was made a party to the partition suit. The trust deed was not recorded for nearly two weeks after the decree in partition was entered.

Duress has been defined as a condition which exists where one by an unlawful act of another is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will. (14 Cyc. 1123.) Mere annoyance or vexation will not constitute duress, but there must be such compulsion affecting the mind as shows that the execution of the contract or other instrument is not the voluntary act of the maker. *Mitchell* v. *Mitchell,* 267 Ill. 244; *Kronmeyer* v. *Buck,* 258 id. 586; *Huston* v. *Smith,* 248 id. 396; *Hintz* v. *Hintz,* 222 id. 248; *Dorsey* v. *Wolcott,* 173 id. 539; *Hagan* v. *Waldo,* 168 id. 646.

It appears from the evidence that Jonas R. Harris, husband of Mary M. Harris, died September 24, 1910, and that a short time thereafter certain of his relatives and the relatives of Mrs. Harris became concerned lest she dispose of her property to their disadvantage. It appears that she made her will on the 5th day of October, 1910, a few days after the death of her husband. It also appears from the record that these relatives knew that she had made this

will; that they engaged appellee Charles W. Flack, of the
firm of Flack & Lawyer, a firm of attorneys of Macomb,
Illinois, and entered into an agreement with him by which
Flack agreed that said firm would "render all legal services
necessary or that may be required in controlling or advising
with Mrs. Mary Harris and in prosecuting any suit or suits
for the appointment of a conservator for Mrs. Harris or
the setting aside of a will or any other legal documents."
The record discloses that the contract of said firm was made
with Flack and that he rendered the services thereunder.
In return for these services Flack & Lawyer were to receive
one-third of all that should be collected from Mrs. Harris
or from her estate after her decease. It further appears
that on November 23, 1910, in pursuance of these agree-
ments Flack procured the commencement of proceedings
in the county court of McDonough county for the appoint-
ment of a conservator for Mrs. Harris. The petition was
filed in the name of John Warner, Ralph Warner and John
M. Davis, on the advice and direction of Flack, who pre-
pared the petition. The petition averred that Mrs. Harris
was a distracted and feeble-minded person, who by reason
of unsoundness of mind was incapable of managing and
caring for her own estate and that her estate was in dan-
ger of being greatly diminished by Daniel O. Harris, who,
the petition states, "apparently controls and dominates the
action and conduct of said Mary Harris." The evidence
shows that service of summons in the conservatorship pro-
ceedings was had upon Mrs. Harris on November 23; that
on November 24 she went to the office of Flack & Lawyer
for the purpose of explaining to them that she had a con-
tract with James C. Hammond to manage her estate for
her, she feeling that that should be sufficient to avoid such
proceedings. The evidence also shows that on that day she
had a conversation with the appellee Flack, who stated to
her that such a contract was not satisfactory to his clients
but that he could draw an instrument that would be, and

for her to return the next day, which she did in company
with Hammond and others, going at his instance and re-
quest to the office of George D. Tunnicliff, who, the evi-
dence shows, had nothing to do with the attempt to control
Mrs. Harris in the disposition of her property. Flack later
came to the office of Tunnicliff. There were present numer-
ous of her relatives, including the ones who signed the peti-
tion for the appointment of a conservator. She beseeched
her brothers John and Ralph to dismiss the petition, but
they refused to talk to her. The evidence shows that she
was nervous, and although advised by Tunnicliff to contest
the petition for conservator, she expressed a fear of going
into court. When the deed was read to her and the state-
ment in the acknowledgment thereto that it was her own
voluntary act, she exclaimed, "No! I cannot say that!" or
words to that effect; that thereupon Flack said, "Well,
everything stops right here," and that she thereafter said,
"I will say it is the best I can do now," and that she signed
the paper and left the office. It is evident that prior to and
at this time there was a definite plan on the part of the rela-
tives of Mrs. Harris, and of Flack, who by contracts with
the relatives became directly interested in securing the trust
deed, to force Mrs. Harris to execute the same, and that as
a part of the plan, and as the potential means of carrying
out the same, the petition for the appointment of a conser-
vator was filed. Nothing further was done concerning the
proceedings and they were later dismissed. The evidence
shows that upon the receipt of summons in the proceedings
for the appointment of a conservator Mrs. Harris was very
nervous and called for her nephew, Horace B. Harris, to
come to her house on the evening of the service of the sum-
mons; that he and his wife went to see her; that she was
crying when they arrived and handed Horace the summons
and said, "Look what they have done to me!" When asked
why she did not go to court she replied that she could not;
that she was never in court and could not go, and asked

Horace to take her to the office of Flack & Lawyer that she might show them the contract she had with Hammond, so that the proceedings might be avoided. The evidence also shows that upon her return home after making the deed on November 25 she was very nervous and crying; that when asked concerning her trouble she replied that they had made her sign what they called a trust deed and she did not want to sign it. Upon being asked why she signed it, she replied that they told her that she had to. The evidence also shows that she did not cease worrying about this trust deed; that she talked almost continuously about the deed until she became a burden to those about her. She very frequently expressed the fear of a conservator. The matter seemed to be almost continuously upon her mind. It appears that after the making of the deed her health was poor and that she was in a very nervous condition.

Upon an examination of the entire testimony in this record we are of the opinion that at the time Mary M. Harris made the trust deed she was under such compulsion, through fear of the conservatorship proceedings, as to affect her mind and that the trust deed was not her voluntary act. The whole of the activities of her relatives and appellee Flack in this case evidences a scheme to deprive this woman of her right to make such disposition of her property as she might see fit. It is evident from the record that none of them considered that any argument which they might present to her would cause her to enter into this trust deed. It is therefore clearly apparent that the conservatorship proceedings were instituted for the sole purpose of overcoming her will and forcing her to do that which they realized and admit they could not induce her to do by any legitimate argument. Such a scheme was an unlawful attempt on their part to interfere with the natural rights and interests of Mrs. Harris, and this court so held in *Flack* v. *Warner, supra,* where the contract of Flack & Lawyer to assist in doing this identical thing was held

to be void, as contrary to good morals and against public policy. There is not a scintilla of evidence in this record that Mrs. Harris would have executed the trust deed, or could have been induced·to do so, had the petition not been filed. The record does show that she frequently said after the deed was made that she did not want to make it but that they made her do so. It is but fair to presume, therefore, that the filing of such proceedings·and the fear aroused in her mind thereby were the compelling and controlling force which brought about the execution of the trust deed and that the same was not her voluntary act.

In the case of *Bane* v. *Detrick,* 52 Ill. 19, Bane secured a warrant for the purpose of coercing the payment of a claim. Through said means he secured a certain mortgage from the appellee, Detrick. It was there held that the securing of the warrant was sufficient duress to avoid the transaction, and that this was true even though the arrest, if it had been made, would have been illegal. It was there held that by reason of such duress appellee's agreement was not an act in the exercise of his free agency. To the same effect is the case of *Willetts* v. *Willetts,* 104 Ill. 122, where a wife released her dower in her husband's lands and estate under circumstances showing that her acts were so affected · by duress and undue influence of her husband that the act of releasing her interest was not her voluntary act.

But it is urged by appellees that on August 30, 1911, by an instrument in writing Mary M. Harris ratified the trust deed, and that the trust deed, even if procured through duress and undue influence, was not void but voidable, only, and that therefore it was subject to such ratification. It appears that on the 4th day of February, 1911, Mrs. Harris served notice on Hammond canceling and annulling the trust deed. Thereafter, on August 30, 1911, she signed what the appellees contend is a ratification of the trust deed. Said instrument, after reciting the cancellation and annulment

of the trust deed and that no further action had been taken on such cancellation, recites: "Now, therefore, this indenture witnesseth that I have and I do hereby withdraw the said paper by which I attempted to cancel, annul and terminate said trust deed to the same, and I hereby re-affirm said trust deed and all its parts." It is contended by appellant that this does not amount to a ratification, for the reason that Mrs. Harris was not at any time free from duress and that the same was not her voluntary act. There is much evidence in the record that she was not strong mentally or physically; that she spent most of her time alone on the farm; that she brooded continuously after the making of the trust deed over what she deemed a great injustice done her by her relatives. It also appears from the evidence that she had sought to get funds from the trustee, Hammond, with which to procure a home in Table Grove; that he refused to give her money unless she would go to Macomb and sign a paper for it; that she eventually did go to Macomb and that the paper she there signed was this so-called ratification. We are of the opinion that at no time after the instituting of the conservatorship proceedings was she free from fear of the same. She frequently expressed to those about her the fear of such proceedings.

It is evident from the record in this case that Mary M. Harris after the filing of the petition for appointment of a conservator over her was under fear of such proceedings at the hands of those who had brought about the situation created through the trust deed. There is much evidence in the record that she was not a woman of strong mentality; that her mental powers grew weaker, until in 1913 a conservator was appointed for her. With this record before us we are convinced that the whole matter had but one purpose, and that was to prevent her making such disposition of her property as she chose. There is no claim on the part of the appellees that these transactions were insti-

tuted or the plans carried out for the purpose of protecting the interests of Mrs. Harris, but the purpose conceived in the whole matter appears well expressed in the contract of Flack with certain of her relatives, wherein the firm agree to give their services in "controlling" Mrs. Harris in the disposition of her property. While a deed obtained under duress may be ratified after the coercing influence has ceased to operate, it is evident, here, that such coercing influence did not cease to operate between the making of the trust deed and the so-called ratification. It follows, therefore, that the cases cited by the appellees on this point are not applicable, as it cannot be contended that a ratification of an instrument can be made so long as the influence of coercion continues. The rule is well stated in Story's Equity Jurisprudence, in section 348, where it is said: "If the party is still acting under the presence of the original transaction or the original necessity, and of the delusive opinion that it is valid and binding upon him, then, under such circumstances, courts of equity will hold him not barred from relief by any such confirmation." We are of the opinion that the trust deed is void, and that it, and the purported ratification thereof, should be held for naught.

As the views herein expressed dispose of the issues in the case it is not necessary to consider further concerning the validity of the trust deed.

The decree of the circuit court will be reversed and the cause remanded, with directions to that court to enter a decree granting the prayer of the bill.

*Reversed and remanded, with directions.*

Mr. Justice Thompson took no part in this decision.