KENNETH D. HOCKING *et al.*, Plaintiffs-Appellees, *v.* ASHLIE R. HOCKING *et al.*, Defendants-Appellants.—(DENNIS A. HOCKING, Defendant-Appellee.)

Fifth District   No. 78-492

Opinion filed August 23, 1979.

David K. Frankland, of Albion, for appellants.

Ray Fehrenbacher, of Fehrenbacher & Whitney, of Olney, for appellees Kenneth D. Hocking, Burl Hocking, and Harriet V. Hocking Chamberlin.

Mr. JUSTICE GEORGE J. MORAN delivered the opinion of the court:

Defendants, Ashlie R. Hocking and Olive H. Hocking, appeal from a judgment of the circuit court of Edwards County finding that they held a 103-acre tract of land in a resulting trust for the heirs of Ashlie R. Hocking's father, Dennis Ashlie Hocking.

On appeal, defendants assert that the evidence presented by plaintiffs, who are the brothers and sister of the defendant Ashlie R. Hocking, was not sufficient to establish a resulting trust, that any rights plaintiffs might have had were waived by their execution of a general

release of all claims arising out of their father's estate, and that their action is barred by laches.

In 1924 Dennis Ashlie Hocking owned a number of parcels of land located in Edwards County, aggregating to 357 acres. The 357 acres included the home place (103 acres), the Steward place (80 acres), Prairie farm (144 acres), the Bonpas bottoms (20 acres), and a 10-acre tract which had no common designation. In addition, Dennis' wife, Myrtle, owned a 50-acre tract known as the "Wade property" which she had inherited from her grandfather. The 357 acres were mortgaged to the Federal Land Bank (hereinafter "Bank").

In March of 1924, the Bank initiated foreclosure proceedings. Following the period of redemption, a master's deed was issued to the Bank. During the proceeding, Dennis attempted unsuccessfully to buy the entire property back from the Bank. The Bank was apparently completely unreceptive to such a sale, and Dennis eventually narrowed his objective to repurchase of the home place.

Late in 1925, defendant Ashlie Hocking agreed to purchase the home place in his name to avoid the impending eviction of his parents and siblings. On March 22, 1926, Ashlie entered a contract for purchase of the home place for the price of $3500. The price was to be paid as follows: $400 on execution of the contract, $300 on or before December 1, 1926, as an interest installment, $2200 paid by execution of a 36-year note to the Bank secured by a first mortgage on the home place, and $600 to be paid by execution of six promissory notes of $100 each, secured by a second mortgage on the home place.

On December 26, 1926, the Bank transferred legal title to Ashlie Hocking. Ashlie remained the sole legal title holder until January of 1968 when he conveyed the property into joint tenancy with his wife and co-defendant, Olive. Dennis retained possession of the property during his lifetime and apparently made all management decisions and collected rents and profits, except for oil royalties, discussed later in this opinion.

During the foreclosure proceeding in the 1920's, Myrtle Hocking transferred legal title in the Wade property to her mother, who on July 17, 1925, transferred the property to Ashlie. All parties concede that Ashlie took only bare legal title and that Myrtle remained the beneficial owner of the property. At Myrtle's direction, Ashlie conveyed the Wade property to his brother Burl in 1931. Burl subsequently divided the property into five 10-acre tracts and conveyed one to each of his brothers and his sister, retaining one for himself. This set of conveyances was also made in compliance with Myrtle's instructions.

Anticipating possible eviction from the home place due to the 1924 foreclosure, Myrtle purchased a home in Bone Gap. Title was held in

Burl's name. At about the same time, Dennis purchased a produce business, which was also eventually titled in Burl's name. The parties agree that Dennis and Myrtle retained beneficial ownership in both of the properties. The produce business accounts were maintained in Burl's name, and Burl signed checks drawn on these accounts, but Dennis and Myrtle maintained complete control over the distribution of all funds connected with the business.

Subsequent to the foreclosure, Dennis purchased 21 acres of farmland, titling it in the names of Ashlie and his sister, plaintiff Harriet Chamberlin. During his lifetime, Dennis retained beneficial ownership of this property. Following Dennis' death in 1968, Harriet and Ashlie sold this acreage and divided the proceeds equally among the five siblings, pursuant to the intent of Dennis Hocking.

In 1941 Ashlie Hocking conveyed an undivided one-quarter interest in the mineral rights in the home place to Paul Blake. While there was some correspondence between Ashlie and Dennis regarding this transaction, it is clear that it was Dennis who negotiated the transfer and made the final decision regarding its completion, and after payment of the remaining indebtedness on the home place, it was Dennis who received the remainder of the purchase price. When problems developed with respect to receipt of oil royalties, a letter was sent over Dennis' signature demanding payment as per the royalty agreement. Ashlie received the royalties from oil production, but retained them in a separate "farm account" which he used exclusively for farm expenses, contributions to his parents' living expenses and the portion of his income tax attributable to the royalties. He also made interest-free loans to Harriet for the purchase of automobiles. Harriet testified that she first obtained permission for the loans from Dennis, then told Ashlie that Dennis had agreed to the loan, whereupon Ashlie gave her the money.

The evidence as to who made the payments on the mortgage on the home place following Ashlie's purchase of the property is hotly disputed. According to plaintiffs' testimony, Dennis made all payments with the possible exception of payments on the $600 second mortgage. Some of these payments were made directly to the Bank, but many were paid to Ashlie, who then paid the Bank with his own check. Burl Hocking testified that he signed several checks which were issued for mortgage payments during the time that the produce business accounts were held in his name. Rosella Hocking, the wife of plaintiff Kenneth Hocking, testified to a conversation she had with Myrtle in the early 1950's in which Myrtle told her that Myrtle and Dennis had repaid Ashlie all of the money paid on the mortgage, except for about $800. Myrtle expressed concern that Ashlie refused to discuss repayment of the $800 with Myrtle and

Dennis. Rosella related the conversation to Olive following Dennis' death. Olive responded that at the time, Dennis' nonpayment of the $800 had prevented Olive and Ashlie from buying their own home. She did not deny that Dennis and Myrtle had repaid Ashlie the balance of the mortgage payments.

Burl testified that during a visit to Ashlie's home in Ohio in 1958, he saw a fully executed warranty deed conveying the home place from Ashlie and Olive to Dennis and Myrtle. Ashlie subsequently introduced an unrecorded quitclaim deed made in 1968, conveying a life estate to Dennis, which he testified he had shown to Burl. Burl denied having seen the quitclaim deed, and stated unequivocally that it was not the deed he had seen in 1958.

Shortly prior to his death, when asked by his children if his affairs were in order, Dennis indicated that they were, and made statements to the effect that Ashlie would handle division of the home place after Dennis' death.

Dennis died in 1968. Disposition of the home place was discussed, but Ashlie made no definite commitment to divide the property. He expressed opposition to its sale, paid all expenses connected with its maintenance, made all management decisions, and collected all rents and profits. The separate account which had accumulated from the oil royalties was divided equally among the five siblings, and Ashlie gave all of them keys to the property. When one of the brothers tried to pay the property taxes, Ashlie refused to allow him to do so.

On March 8, 1969, all of the siblings signed the following release:

### "GENERAL RELEASE

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, Ashlie R. Hocking, Kenneth D. Hocking, Burl A. Hocking, Dennis Atwood Hocking, Jr., and Harriet V. Chamberlin, being the only heirs at law and next of kin and legatees under the purported will of Dennis Ashlie Hocking dated October 23, 1967, and their respective spouses, for and in consideration of the sum of $797.67 paid to and received by said heirs and legatees as their distributive shares in said decedent's estate and under a written agreement dated October 23, 1968 between Ashlie R. Hocking, Kenneth D. Hocking, Burl A. Hocking, Dennis Atwood Hocking, Jr., and Harriet V. Chamberlin pertaining to the administration out of court of the estate of their father, Dennis Ashlie Hocking who died October 18, 1968, do hereby release each other, Harriet V. Chamberlin, executor named in said decedent's last will and testament referred to in said agreement, the estate of Dennis

Ashlie Hocking, deceased, and said Harriet V. Chamberlin as agent or attorney in fact for the parties to said agreement under the terms and conditions thereof, from all claims, causes of action, debts, sums of money, controversies, agreements, promises, variances, trespasses, damages and demands whatsoever in law or in equity.

WITNESS our signatures this 8th day of March, 1969."

There was substantial conflicting testimony regarding at whose direction the release was drawn, but Harriet was the administratrix of the estate, and the letter directing the attorney to draw the release was written by Harriet, with some input from a letter written by Dennis, Jr. Plaintiffs allege that Ashlie was in fact guiding Harriet's actions, and performed as a *de facto* administrator. Ashlie denies this.

Subsequently, Harriet's personal circumstances required consolidation of her resources and in September 1973, she wrote to Ashlie requesting that he divide the home place. Ashlie asserted full ownership of the property. On November 12, 1976, this action was filed, alleging both a resulting and a constructive trust in Ashlie for the benefit of the heirs of Dennis. Following a bench trial, the court found that Ashlie held the property in a resulting, but not a constructive trust.

■■ A resulting trust arises when one party provides the consideration for a transfer of title of property, but the title to the property is transferred to a different party. (*Wright v. Wright* (1954), 2 Ill. 2d 246, 118 N.E.2d 280; *Kohlhaas v. Smith* (1961), 408 Ill. 535, 97 N.E.2d 774.) A sufficient showing that one other than the legal title holder paid the purchase price for the property makes a *prima facie* case that beneficial ownership rests in the payor. (*Prassa v. Corcoran* (1962), 24 Ill. 2d 288, 181 N.E.2d 138; *West v. Scott* (1955), 6 Ill. 2d 167, 128 N.E.2d 734; *Lutyens v. Ahlrich* (1923), 308 Ill. 11, 139 N.E. 50.) The trust arises by operation of law, and while no contract or agreement need be shown (*Kohlhaas v. Smith*), the doctrine of resulting trust is based on the presumed intent of the payor to own and enjoy that for which he has paid. (*West v. Scott* (1955), 6 Ill. 2d 167, 128 N.E.2d 734; *Paluszek v. Wohlrab* (1953), 1 Ill. 2d 363, 115 N.E.2d 764.) The presumption may be overcome by a showing that the payor in fact intended to confer a beneficial interest in the property upon the legal title holder. *Prassa v. Corcoran; Clark v. Clark* (1947), 398 Ill. 592, 76 N.E.2d 446; *Frewin v. Stark* (1925), 319 Ill. 35, 149 N.E. 588.

■■ The trust arises at the time the title to the property vests, or it does not arise at all. (*First National Bank & Trust Co. v. Illinois Bank and Trust Co.* (1960), 19 Ill. 2d 385, 167 N.E.2d 223; *Kohlhaas v. Smith.*) If the trust does not arise then, it will not be created by the payor's change of mind at a later date. (*Brod v. Brod* (1945), 390 Ill. 312, 61 N.E.2d 675.) Actions of the parties subsequent to the vesting of title have little bearing on the issue

of trust (*Hanley v. Hanley* (1958), 14 Ill. 2d 566, 152 N.E.2d 879; *Wright v. Wright* (1954), 2 Ill. 2d 246, 118 N.E.2d 280; *Kohlhaas v. Smith*), except insofar as those actions are probative of the original intent of the parties (*Suwalski v. Suwalski* (1968), 40 Ill. 2d 492, 240 N.E.2d 677; *Prassa v. Corcoran*). Subsequent declarations or admissions of the parties bear even less evidentiary weight than their action. (*Curielli v. Curielli* (1943), 383 Ill. 102, 48 N.E.2d 360; *Orear v. Farmers State Bank & Trust Co.* (1919), 286 Ill. 454, 122 N.E. 63; *Dodge v. Thomas* (1914), 266 Ill. 76, 107 N.E. 261.) The intent of the parties must be gathered from the totality of the facts and circumstances established by the evidence. *Prassa v. Corcoran*; *West v. Scott*.

■■■ In order for a resulting trust to arise, the payor does not have to produce the consideration for the transfer at the time of the transfer, if the purchase price is deemed a loan to the payor, either of tangible assets or credit, and the payor is the party deemed by the legal title holder to be primarily responsible for the ultimate payment of the purchase price. (*Suwalski v. Suwalski*; *Prassa v. Corcoran*; *Wright v. Wright*; *Fields v. Fields* (1953), 415 Ill. 324, 114 N.E.2d 402; *Frasier v. Finlay* (1940), 375 Ill. 78, 30 N.E.2d 613.) In effect, the payment may be deferred, so long as the original intent of the parties is that the payor will ultimately furnish the consideration for the transfer. In such a case, the legal title holder takes the title as security against payment by the payor.

■■ The burden of proving the trust is on the advocate of the trust, and it must be established by clear, strong, unequivocal evidence which convinces the trier of fact beyond doubt that such trust was created. (*First National Bank & Trust Co. v. Illinois Bank and Trust Co.*; *Hanley v. Hanley* (1958), 14 Ill. 2d 566, 152 N.E.2d 879; *Wright v. Wright*; *Carlson v. Carlson* (1951), 409 Ill. 167, 98 N.E.2d 779; *Hille v. Barnes* (1948), 399 Ill. 252, 77 N.E.2d 809; *Curielli v. Curielli*.) If the transaction is susceptive of any other reasonable interpretation, then no trust will be found. (*Carlson v. Carlson*; *Hille v. Barnes*.) However, when the evidence presented is contradictory, the factual determinations necessary to decide the case are left to the trial court, which has the opportunity to view the witnesses and assess their credibility. These determinations will be disturbed on review only if they are against the manifest weight of the evidence. *Hanley v. Hanley*; *White v. Underwood* (1953), 1 Ill. 2d 620, 116 N.E.2d 354; *Dean v. Dean* (1948), 401 Ill. 406, 82 N.E.2d 342; *Kane v. Johnson* (1947), 397 Ill. 112, 73 N.E.2d 321.

■■ Upon reviewing this record, we cannot say that the trial court's decision was against the manifest weight of the evidence. While we are aware that possession and control of property are not by themselves sufficient indicia of beneficial ownership to find a resulting trust (*Dodge v. Thomas*), we hold that those factors, in conjunction with a demonstrated

pattern of estate planning and financial management by deed on the part of Dennis and Myrtle, and the testimony of Burl Hocking as to payment of the mortgage with funds actually owned by Dennis, constituted sufficient evidence upon which the trial court could find a resulting trust. Certainly much of the evidence presented required assessment of witness credibility, and we will not substitute our evaluation of credibility for that of the trial court. In addition, we have carefully reviewed the voluminous correspondence between Ashlie and his siblings and Ashlie and his parents. While the trial testimony is disputed, the correspondence clearly supports the trial court's actual determination.

■■ Defendants next allege that plaintiffs are barred from pursuing this action by their execution of general release after Dennis' death. Defendants cite no authority for this proposition and do not assign error in the trial court's consideration of any evidence relevant to the agreement. While objection was interjected based upon the inadmissibility of parol evidence to expand or interpret a document which is complete and unambiguous on its face, the defendants do not challenge the evidence regarding the release on appeal.

■■ The plaintiffs testified that the release was drawn and executed with the common understanding that it pertained solely to property within the estate of Dennis Hocking. This position tends to be confirmed by a memorandum of agreement executed on October 23, 1968. The release states that it is executed pursuant to that agreement. The agreement is by its terms limited to the probate estate of Dennis Hocking, and a finding by the trial court that the release was also so limited is clearly permissible upon this record. The 103-acre home place titled in defendants and the 21-acre tract titled in Ashlie and Harriet were not part of Dennis Hocking's probate estate and consequently would not have been covered by the agreement or the release. In fact, several of the plaintiffs testified that this was their understanding of the effect of the release.

■■ ■ Defendants contend that plaintiffs' action should be barred by laches. We disagree. The doctrine of laches forecloses a party's cause of action if he unreasonably delays asserting his claim. (*Carlson v. Carlson*; *Orear v. Farmers State Bank & Trust Co.*) But the beneficiaries of a trust have the right to assume that the trustee will deal fairly with them, and laches will not be found where the beneficiaries take action within a reasonable time after the trustee repudiates the trust. (*Reynolds v. Sumner* (1888), 126 Ill. 58, 18 N.E. 334.) Further, courts are inclined to leniency where the parties between whom litigation ultimately arises are closely related and stand in intimate relation to each other. (*Lutyens v. Ahlrich.*) As the plaintiffs did pursue their remedy within a reasonable time after defendants' 1973 repudiation of the trust, and as all of the

parties are siblings in what was apparently a fairly close family prior to this controversy, we hold that the action was not barred by laches.

Accordingly, the decision of the Edwards County Circuit Court is affirmed.

Affirmed.

JONES, P. J., and KARNS, J., concur.