ZACK COMPANY *et al.,* Plaintiffs-Appellants, *v.* WILLIAM E. SIMS *et al.,* Defendants-Appellees.

First District (5th Division)   No. 80—3266

Opinion filed July 16, 1982.—Supplemental opinion filed on denial of rehearing August 20, 1982.

Donald R. Harris, Joseph G. Bisceglia, and Jon D. Botsford, all of Jenner & Block, of Chicago, for appellants.

William J. Harte, Ltd., Richard J. Prendergast, Ltd., Joseph N. Casciato, and Karen Hamity, all of Chicago (William J. Harte and Richard J. Prendergast, of counsel), for appellees.

JUSTICE MEJDA delivered the opinion of the court:

This is an action by the Zack Company, Christine Zack DeZutel (hereinafter Christine) and Isabell A. Zack (hereinafter Mrs. Zack) against William E. Sims and Terre Haute Industries, Inc. (hereinafter THI), claiming that plaintiffs were entitled under a number of different legal grounds, to recover certain corporate stock and other assets from defendant Sims. The eight-count complaint in chancery was filed on January 30, 1976. An amended complaint was filed on September 26, 1978.[1]

The trial commenced on March 5, 1979, and, after a number of adjournments, was concluded on October 2, 1979. The parties filed written briefs, suggesting appropriate findings, and on July 2, 1980, the trial court heard oral argument. On October 3, 1980, the trial court issued an oral ruling indicating that judgment would be entered for defendants on a number of issues. Then, on December 2, 1980, the trial court entered its findings of fact and conclusions of law, entering judgment in favor of defendants and against plaintiffs on all counts of the amended complaint.

---

[1]Counts I and III were based on the theory of resulting trust. Counts II and IV were grounded on the theories of constructive trust, common law fraud, and violation of Illinois and Indiana securities laws. Count V was based on duress. Counts VI and VII were derivative claims brought on behalf of Zack Company and Terre Haute Industries for corporate waste. Count VIII was based on a theory of constructive trust and unjust enrichment.

Plaintiffs appeal, contending that: (1) the trial court's findings are contrary to the overwhelming weight of the evidence, and in some cases contrary to undisputed evidence or based on no evidence at all; (2) the trial court erred in according credibility to certain witnesses; and (3) the trial court erred in limiting discovery, and in admitting and excluding certain evidence at trial.

The parties herein have submitted extensive factual summaries in their respective briefs tracing the history of the Zack Company and the Zack family and the circumstances under which Sims became the owner of the common stock of THI and 44% (186 shares) of the stock of Zack Company. The evidence adduced at trial consisted of testimony of an array of witnesses and substantial documentary evidence. Facts necessary for determination of this appeal are set forth below. Additional facts will be referred to in this opinion only as they are necessary for the determination of particular issues presented.

The Zack Company is an Illinois corporation engaged in sheet metal fabrication and contracting. The company was founded in 1922 by Hans J. Zack, husband of plaintiff Mrs. Zack, and father of plaintiff Christine. Defendant THI is an Indiana corporation also in the business of metal fabrication. Defendant Sims, president of THI, is the former husband of Christine[2] and former son-in-law of Mrs. Zack.

In 1946 Hans set up the "Christine Zack Trust" for his daughter's benefit, placing in trust 200 of Zack Company's 500 outstanding shares of stock, other stock and approximately $150,000 in cash, notes and bonds. Under the terms of the Christine Zack Trust, Christine was to receive 25% of the trust corpus at age 21 (1960), another one-third at age 25 (1964), and the balance at age 30 (1969). Christine was also beneficiary of a guardianship account, containing about $85,000, which was distributed to her in 1958 after her 18th birthday.

Hans Zack died in October 1956. After his death Mrs. Zack became president of Zack Company and Charles Howard became general manager. Two additional trusts, a marital trust and a residuary trust, were created by Hans Zack's will. Mrs. Zack was the trustee and life beneficiary with a power of appointment over the marital

---

[2]As an outgrowth of the termination of the marriage of Christine and William Sims, the respective parties have reserved for subsequent determination in the Domestic Relations Court, the question of whether certain assets which are the subject of this action are to be treated as marital or nonmarital property for purposes of ultimate disposition under the Illinois Marriage and Dissolution of Marriage Act. (Ill. Rev. Stat. 1979, ch. 40, par. 503.) Accordingly, we intend and express no opinion as to the marital or nonmarital character of these assets in the determination of this appeal.

trust, and also trustee and life beneficiary of the residuary trust, with Christine the vested remainderman after her death. One hundred eighty-six shares of Zack Company stock were put into the marital trust and 33 shares into the residuary trust. The balance of 200 shares remained in the Christine Zack Trust, of which Mrs. Zack became trustee.

In 1959 Christine married Sims. Immediately after their marriage Sims became an employee of Zack Company, remaining a continuous employee from 1960 until January 1976 when he was terminated. During the first few years of their marriage, Christine and Sims maintained one joint checking account and deposited monies they received from any source into that account. Later Sims opened up a "special" checking account into which he deposited his salary checks, while Christine continued to maintain the joint checking account with her salary from Zack Company. She paid all routine family household expenses out of that account and Sims would contribute when she became low in funds. Sims' Zack Company compensation increased from $12,600 in 1964 to $70,000 in 1971. Three children were born to the Sims family during their marriage.

### THE THI TRANSACTIONS

In 1967 Howard learned of the availability of an old boiler works plant in Terre Haute, Indiana, which he thought could serve as a production facility for Zack Company. Mrs. Zack, however, rejected any such expansion. Sims, on the other hand, became interested in the Terre Haute facility and formulated the idea of making a separate corporation. Sims testified that early in 1967 he asked Mrs. Zack if it would be possible to acquire some equipment from the Zack Detroit operation for the Terre Haute company. He said she indicated that the stockholders were not interested in investing any more money but that "if it was such a great opportunity, why didn't he do it himself," and that there were funds available for him to borrow.

After Mrs. Zack gave Howard and Sims approval, the building in Terre Haute was purchased in late 1967. The Zack Company paid the $25,000 earnest money deposit on behalf of the new company. Later, in January 1968, the Hans Zack residuary trust took title to the property, reimbursed the Zack Company for the earnest money deposit, and paid the balance of approximately $155,000 for the property. The residuary trust eventually took back a note from the new company (THI) for the purchase price, at 4% interest.

In early 1968, Howard drafted the details of the proposed incorporation. This document indicated that the "beginning shareholders" were to be "William E. Sims and Christine Zack Sims" with an 80%

interest, "Charles L. Howard" with a 10% interest, and "Stephan W. Duncan" with a 10% interest. This document was approved by Howard and Sims, who then presented it to Mrs. Zack, who in turn referred the matter to her attorney, Andrew Gatenbey. Following assurance by either Sims or Howard that the joint ownership arrangement was acceptable to everyone, Gatenbey indicated his approval of the incorporation details by initialing the document. A few weeks later a Terre Haute attorney, Sam Beecher, sent to Howard for final signature typed incorporation papers still showing Christine as an incorporator and shareholder. Howard took no further action with respect to the documents, however, until months later in September 1968.

During the above period, THI went into full operation using various assets and benefits obtained from the Zack Company and other Zack family sources. These assets included the purchase by THI of the Zack Detroit operation, including all work-in-progress, inventory, accounts receivable and the transfer of key personnel. The Zack Company in turn received a note for $198,000 at 4% interest for these items, which was subsequently paid by THI. In addition, other assets were leased from Zack Company for an annual rental, and administration services were provided by Zack Company, for which THI was paid $10,000 per year. The amounts charged for administrative services, leasing of equipment and the sale of work-in-progress by Zack Company to THI, as well as other matters involving Zack Company's relationship with THI, were determined by Howard, as general manager of Zack Company. Zack family sources, including the residuary trust and the Zack Foundation, also provided long-term loans to THI totaling $678,983, and guaranteed without consideration another $371,000 in bank loans. The Zack Company also guaranteed THI's credit with its suppliers, and its performance under numerous contracts, and provided other services and intangible benefits to the new company.

In September 1968 Howard and Sims reviewed the incorporation documents which had been forwarded by Beecher, and began to make some necessary revisions, most notably the deletion of Stephan Duncan's name as 10% shareholder due to Duncan's withdrawal from the enterprise. At that time Sims told Howard to also eliminate Christine's name as a subscriber and joint shareholder. Howard had the documents retyped to reflect the changes and mailed them to Beecher with instructions to proceed with the incorporation. Actual THI stock certificates were not prepared by Howard until January 1973. Christine testified that at all times Sims represented to her that THI was a venture for their mutual benefit and not for himself alone, and that she did not learn otherwise until late in 1973 when a divorce was contemplated.

## THE USE OF CHRISTINE'S MONEY
## TO PURCHASE THE THI STOCK

In 1961 Christine, on Sims' advice, placed $55,000 which she received from the Christine Zack Trust into joint certificates of deposit at Olympic Savings & Loan. In 1966 she agreed to let Sims close the accounts. Sims testified that he put the money into their joint safety deposit box in 1966. In November 1967 Christine deposited approximately $28,000 she received from the above trust into the joint household checking account. Christine testified that she agreed that this money could be used to invest in THI. Accordingly, Sims wrote a $28,000 check to cash on the account on December 7, 1967, and placed the $28,000 cash into the joint safety deposit box.

Sims testified that after the above $83,000 was put into the safety deposit box, he used $45,000 from the box, in early 1968, to pay THI for 4,500 shares of stock, representing 90% of outstanding THI stock. He also testified that later he took another $50,000 from the safety deposit box, and that he loaned it to THI on June 27, 1968. After these two transactions, according to Sims' testimony, the cash fund was depleted.

Sims stated that he had at least $45,000 of his own money in the safety deposit box which he used to pay for the stock. The money he used came from his income, company salary and cash gifts made to him by Mrs. Zack during the earlier years of his marriage. He testified that he also made $12,000 on a salvage job in earlier years, although his income tax returns for those years showed no such income. Sims offered no documentary evidence to corroborate his contributions to the joint safety deposit box funds. It is undisputed that the $45,000 used by Sims to purchase the stock came from the cash fund kept in that joint safety deposit box.

In 1972 Sims purchased the 500 THI shares (10%) then held in the name of Howard for $10 per share, for a total of $5,000. Under the agreement Howard received $5,000 cash and was to receive a specified percentage of THI's earnings each year until he reached age 65. The $5,000 payment was made from Sims' personal checking account. Pursuant to the agreement Howard received $8,550 in January 1973. This payment was also made from Sims' checking account. Then, in the spring of 1973, under a verbal agreement to extinguish any future rights, Sims bought out Howard's interest completely with a lump sum payment of $40,000. This payment was made with proceeds of a check, repaying the original $50,000 loan made to THI on June 27, 1968, with the funds in the joint safety deposit box. Sims cashed the check, totaling $68,825.20 with accrued interest, on May 1, 1973, used $40,000 to pay Howard, and deposited the balance of $28,825.20 into his special checking account. The stock certificates for

the 500 THI shares were issued in the name of "William E. Sims."

## THE ZACK COMPANY TRANSACTIONS

The evidence as to events leading up to the sale of 186 shares (44%) of Zack Company stock held by the marital trust to Sims is disputed. According to Sims' testimony, in the fall of 1971 Mrs. Zack asked him if he was interested in buying the Zack stock for about $1 million. Since Sims was not interested in a minority position in the Zack Company, he agreed to purchase the stock provided that Mrs. Zack would agree to resign as trustee of the residuary trust in favor of Christine. Mrs. Zack agreed to these terms, but at a later meeting at the office of attorney Gatenbey she refused to resign as trustee of the residuary trust. Sims had no desire to proceed with the deal under such circumstances. Howard and Christine testified that following the meeting Sims angrily ordered that his children were not to see Mrs. Zack, their grandmother, any more. Sims denied making such a statement. Christine also testified that on the day following the meeting she voluntarily tendered to Sims an executed power of attorney which she had had prepared earlier in 1971. It was undisputed that from the time of the aborted sale in 1971 until May 1973 the Sims family had virtually no contact with Mrs. Zack. The extent and cause of the estrangement between Mrs. Zack and the Sims family during this time was, however, largely disputed.

On May 29, 1973, Mrs. Zack resurrected her offer regarding the stock sale. Howard prepared an agreement which provided, *inter alia*, that the marital trust, of which Mrs. Zack was trustee and beneficiary, would receive $800,000 for the 186 shares of Zack stock and another $200,000 already owed to the trust by the Zack Company on a note, for a total price of $1 million. Christine testified that Sims notified her of the offer and that Mrs. Zack saw her grandchildren that very weekend for the first time in two years. The agreement was later modified to include the transfer of Mrs. Zack's interest in Artic Engineering to Sims. Sims and Howard decided that Sims should offer to pay Mrs. Zack $88,000 for the Artic stock and reduce the price of the Zack stock by the same amount to $712,000.

Under the final terms of the 1973 transaction: (1) Mrs. Zack sold the 186 shares of stock held by the marital trust for $712,000; (2) the Zack Company paid back a $200,000 loan to the marital trust; (3) Mrs. Zack sold her interest in Artic Engineering for $88,000, which Sims immediately sold for the same price to Howard and William Mitchell; and (4) Mrs. Zack resigned as trustee of the residuary trust in favor of Christine, and assigned her life interest in the trust to Christine. The stock certificates were issued in the name of Sims alone. Christine testified that she was aware of this fact but thought that the

stock was being purchased for their mutual benefit.

## THE USE OF CHRISTINE'S
## MONEY TO PURCHASE THE 186 SHARES

In order to purchase the 186 shares of 1973, Sims arranged for an $800,000 bank loan. Christine pledged her 200 shares of Zack stock as part of the collateral for this loan. Plaintiffs presented documentary evidence to establish that Sims used $28,825 received as part of the proceeds of the $50,000 loan made to THI from the safety deposit box in 1968, as part of the purchase of the Artic Engineering stock. The Artic stock then was immediately sold to Howard and Mitchell for $88,000 and $84,000 of the sale proceeds was deposited in Sims' account along with the original $800,000, bringing the account balance to $884,000. Sims then used $712,000 to pay Mrs. Zack for the 186 shares and immediately repaid $150,000 to the bank to reduce the loan balance to $650,000. The interest payments on the loan were made by Sims using various funds, including funds received from Christine.

The bank required that the note evidencing the $650,000 loan balance be renewed every six months. On one occasion in December 1974 Sims simulated Christine's signature on the renewal note. Prior to this the bank had indicated that his signature on her behalf was unacceptable since the bank had no power of attorney on file relating to Christine. At this time Sims was in possession of the power of attorney Christine had given to him with respect to her 200 shares of Zack Company. Christine testified that had the documents been placed in front of her at the time, she would have signed them herself, and had she known that Sims signed her name, she would not have charged him with forgery.

In January 1975 Sims caused THI to pay back its outstanding loans, paying $65,000 balance on a note it owed to Christine and a $402,500 note it owed to the residuary trust, and other notes owed to Sims. Christine thereupon loaned to Sims, at an interest rate of "zero percent per annum," the $402,500 from the residuary trust and $65,000 of her own money. The notes were payable within 30 days after the sale of the Zack Company. Sims used the $467,500 received from Christine, together with other funds, to pay the $650,000 balance on the bank loan.

Later, in February 1975, Sims converted to cash the balance of money remaining in his checking account and invested various large sums in certificates of deposit in the Cayman Islands. The Cayman accounts were opened originally in the joint names of himself and Christine, although her name was deleted in 1975 when the divorce was contemplated. Sims also made other investments in 1975 including

loans to personal friends and an investment in the Mitchell Film Company.

In support of Zack Company's claim for excessive compensation and corporate waste, there was considerable evidence presented relating to Sims' compensation from both Zack Company and THI, particularly from 1974 through 1975. Plaintiffs also presented evidence regarding Sims' purchase of two corporate airplanes, one for THI, and another for Zack Company, and further adduced testimony regarding the relative company and noncompany use of these aircraft.

OPINION

I

Plaintiffs first contend that the evidence at trial overwhelmingly supported a finding that Christine was entitled to the THI stock upon the theory of a resulting trust.

A resulting trust is an intent enforcing device (*In re Estate of Wilson* (1980), 81 Ill. 2d 349, 410 N.E.2d 23), which arises by operation of law and has its roots in the presumed intention of the parties. (*Wright v. Wright* (1954), 2 Ill. 2d 246, 118 N.E.2d 280.) The trust is founded upon the "natural equity" that one who pays for the property should enjoy it, unless he or she intended by the vesting of title to confer a beneficial interest upon the grantee. (*Bowman v. Pettersen* (1951), 410 Ill. 519, 102 N.E.2d 787.) The trust usually comes into being when one person furnishes the consideration, or an aliquot part thereof, for the purchase of property while the conveyance is taken in the name of another. *Tilley v. Shippee* (1958), 12 Ill. 2d 616, 147 N.E.2d 347.

The trust arises at the time the title to the property vests, or it does not arise at all. (*First National Bank & Trust Co. v. Illinois National Bank & Trust Co.* (1960), 19 Ill. 2d 385, 167 N.E.2d 223.) If the trust does not arise then, it will not be created by the payor's change of mind at a later date. (*Brod v. Brod* (1945), 390 Ill. 312, 61 N.E.2d 675.) The parties' actions subsequent to the vesting of title have little bearing on the issue of trust (*Hanley v. Hanley* (1958), 14 Ill. 2d 566, 152 N.E.2d 879; *Wright v. Wright*), except insofar as those actions are probative of the original intent of the parties. (*Suwalski v. Suwalski* (1968), 40 Ill. 2d 492, 240 N.E.2d 677.) Subsequent declarations or admissions of the parties bear even less evidentiary weight than their actions. *Curielli v. Curielli* (1943), 383 Ill. 102, 48 N.E.2d 360; *Hocking v. Hocking* (1979), 76 Ill. App. 3d 29, 394 N.E.2d 653.

The intention of the person paying for the property is the key to the doctrine of resulting trust (*In re Estate of Wilson*), and such intention must be gathered from the facts and circumstances of each in-

dividual case. (*Bowman v. Pettersen.*) The burden of proof is upon the party seeking to establish a resulting trust and the evidence must be clear, convincing and unmistakable. (*Wright v. Wright.*) The payment of consideration raises a *prima facie* presumption of a resulting trust which may be rebutted by proof that an intention that the grantee take a beneficial interest and not merely legal title (*In re Estate of Wilson*); however, if the transaction is susceptive of any other reasonable interpretation, then no resulting trust will be found. *Carlson v. Carlson* (1951), 409 Ill. 167, 98 N.E.2d 779.

If the evidence is contradictory, the factual determinations necessary to decide the case are left to the trial court, which has the opportunity to view the witnesses and assess their credibility. The trial court's determinations will not be reversed unless they are against the manifest weight of the evidence (*Hanley v. Hanley* (1958), 14 Ill. 2d 566, 152 N.E.2d 879), or unless there is clear and palpable error in some other respect. (*Brown v. Commercial National Bank* (1969), 42 Ill. 2d 365, 247 N.E.2d 894; *Crose v. Crose* (1980), 91 Ill. App. 3d 216, 414 N.E.2d 872.) When the testimony at trial is contradictory, a reviewing court will not substitute its judgment as to the credibility of the witnesses or reweigh the evidence. *Mortell v. Beckman* (1959), 16 Ill. 2d 209, 157 N.E.2d 63.

Upon reviewing this record, we are convinced that the trial court's finding that Christine's funds were not used to purchase the 4,500 shares of THI stock was contrary to the manifest weight of the evidence. The documentary evidence clearly established that $83,000 of the cash deposited in the joint safety deposit box was contributed by Christine. Sims' own testimony was that after paying $45,500 for the THI stock and then making a $50,000 loan to THI a few months later, the money in the box was depleted. Although Sims' testimony established other sources of income which may have been contributed to the cash fund, such sources were totally undocumented, and in the instance of "money earned from salvage operation," contrary to Sims' tax return filed for the years in question. The evidence presented required assessment of documentary evidence as well as witness credibility. Although we do not substitute our evaluation of credibility for that of the trial court, we hold that the trial court's finding on this issue is clearly irreconcilable with the substantial documentation of the transaction presented by plaintiffs. On this record it is in our opinion firmly established that some of Christine's money had to be used to purchase the 4,500 THI shares. Thus, we must consider whether the evidence sufficiently established the existence of a resulting trust with respect to those shares.

As noted among the foregoing principles, intention is the key to the doctrine of resulting trust. The extent of the resulting trust

arising from the presumed intention, however, can in no case be contrary to the actual intention as proved by proper evidence. (*Hinshaw v. Russell* (1917), 280 Ill. 235, 117 N.E. 406.) Christine contends here that the evidence supports the imposition of a trust on all 4,500 shares of THI stock or, in the alternative, on a percentage of the shares proportionate to the amount of consideration specifically traced to her funds.[3] Plaintiffs, however, also assert that Christine intended to own the stock mutually with her husband. Assuming plaintiffs' later contention is true, then it may be reasonably interpreted that Christine intended to confer beneficial interest in one-half of the shares in her husband. A resulting trust may exist as to part of the property, or a part of the interest therein, according to the intent existing at the time of the transfer. The resulting trust also may be rebutted as to a part of the interest in the property. (See *Cook v. Patrick* (1891), 135 Ill. 499, 26 N.E. 658.) We are of the opinion that the theory of resulting trust applies to the 4,500 shares of THI stock representing 90% of the outstanding shares of the company. However, giving effect to the intent of Christine as evidenced by her trial testimony, and inferred from the facts and circumstances existing at the time of the purchase of the stock by Sims, we imply and therefore impose a resulting trust in the 4,500 shares in favor of Christine to the extent of a one-half interest only.

Plaintiffs also contend that the trial court erred in failing to impose a resulting trust on any of the remaining 10% interest in THI conveyed by Howard to Sims. Upon reviewing the record, we cannot say that the trial court's determination was against the manifest weight of the evidence. While we are aware that the $40,000 payment to Howard completing the transfer of the remaining 500 shares was made with proceeds of a check, repaying the original $50,000 loan made to THI from the funds in the joint safety deposit box, we cannot say that the transaction was not susceptive of any other reasonable interpretation, namely that the money was originally loaned to Sims by Christine. The evidence is contradictory and rests largely on the assessment of the credibility of the witnesses and we will not substitute our judgment for that of the trial court who heard the evidence and observed the witnesses. A loan and a resulting trust are inconsistent. (*Fields v. Fields* (1953), 415 Ill. 324, 114 N.E.2d 402.) We feel there was sufficient evidence to defeat the implication of a resulting trust with respect to the 500 shares at issue.

---

[3]On the instant record it is impossible to assign a certain percentage to the cash contribution of the respective parties to the cash fund. Based on the substantial evidence adduced on this point, however, at least one-half of the money used to purchase the THI stock was clearly traceable to Christine's funds.

## II

At this juncture it is necessary to comment on the trial court's findings with respect to certain loans at issue. In paragraph 17 of the findings of fact, the trial court found that in 1968, $50,000 was borrowed by Sims from Christine on behalf of THI, and that this amount and $18,825.25 in accumulated interest was repaid on or about May 1, 1973. Sims, however, testified that he has not yet repaid this loan to Christine. In paragraph 50 of the findings the trial court found that all loans made by any party to THI or Sims were repaid. Sims, however, testified that a $100,000 loan made to him by Christine in the fall of 1970 was also outstanding. Defendants in their brief in this court and again during oral argument have conceded that the finding in paragraph 50 is in error as to repayment of these two loans. Accordingly, we hold that paragraph 17 should be modified to reflect the fact, that although the $50,000 loan plus $18,825.25 in accumulated interest was repaid to Sims by THI on or about May 1, 1973, neither the principal amount nor the accumulated interest has been repaid to Christine. We hold further that paragraph 50 should be modified to reflect the fact that the $50,000 loan plus $18,825.25 accumulated interest, and the $100,000 loan, have not been repaid by Sims, are yet due and owing to Christine. Furthermore, we hold that the judgment must be accordingly modified to provide for recovery by Christine against Sims for the aggregate sum of $168,825.25.

## III

■ Plaintiffs next challenge the trial court's finding that no constructive trust should be imposed on the THI stock. A constructive trust is a restitutionary remedy which is imposed when one party holds property which in equity and good conscience should be possessed by another. (*Steinmetz v. Kern* (1941), 375 Ill. 616, 32 N.E.2d 151; *Edwards v. Miller* (1978), 61 Ill. App. 3d 1023, 378 N.E.2d 583; *In re Estate of Ray* (1972), 7 Ill. App. 3d 433, 287 N.E.2d 144.) Constructive trusts have traditionally been divided into two general groups (1) where actual fraud exists, and (2) where there is an abuse of a confidential or fiduciary relationship. (*Steinmetz v. Kern; David v. Russo* (1980), 91 Ill. App. 3d 1023, 415 N.E.2d 531.) The remedy is not limited to such situations, however, and a constructive trust may be imposed whenever facts are shown in which a person holding property would be unjustly enriched if he were permitted to retain that property. *Chicago Park District v. Kenroy, Inc.* (1982), 107 Ill. App. 3d 223; *In re Estate of Ray.*

The plaintiffs argue that the trial court's finding that there was no actual fraud proved was against the overwhelming weight of the evidence. We note that actual fraud is never presumed and must be

proved by clear and convincing evidence. *Ray v. Winter* (1977), 67 Ill. 2d 296, 367 N.E.2d 678.

The evidence on this point is conflicting. In support of her claim, Christine testified that Sims had always represented to her that THI would be a venture for their mutual benefit. She related that in December 1967 Sims told her that if she gave him $28,000 of her money, he would invest in "their" company. Plaintiffs also offered the testimony of Zack general manager Howard, attorney Gatenbey, Joe Ordos, a personal friend of Sims, THI general manager Duncan, and Harold Linville, a personal friend of Sims, to corroborate the fact that Sims had made such representations to Christine regarding the ownership of THI.

At trial Sims denied making any such representation to anyone and insisted his position had been consistent since 1968. Sims, however, admitted that he never told Christine that she did not have any ownership interest in THI, or that he had had the stock issued in his own name.

■ Since the evidence on the question of actual fraud was conflicting, the question was one of fact for the trial court. (*Lux v. Lelija* (1958), 14 Ill. 2d 540, 152 N.E.2d 853.) The trial court in particular found the testimony of Christine, Howard and Ordos to be not credible nor worthy of belief. The testimony of William Sims, however, was found to be both credible and worthy of belief. The determination of the credibility of the witnesses and the weight to be given their testimony is peculiarly within the province of the trial judge (*Glass v. Burkett* (1978), 64 Ill. App. 3d 676, 381 N.E.2d 821; *In re Estate of Ray* (1972), 7 Ill. App. 3d 433, 287 N.E.2d 144), and we will not substitute our judgment on these issues. The trial court was in a much better position to determine the facts than is this court. We are of the opinion that there was sufficient evidence to support the court's finding that no actual fraud was proved in this case.

We now must consider whether the trial court erred in holding that no fiduciary relationship existed between Sims and Christine at the time the THI stock was acquired by Sims.

Generally, proof of a confidential or fiduciary relationship requires a showing that one person has reposed trust and confidence in another who thereby gains a resulting influence or superiority over the other. (*Ray v. Winter.*) The marital status alone does not establish a fiduciary relationship (*Pollard v. Pollard* (1957), 12 Ill. 2d 441, 147 N.E.2d 66), and where a fiduciary relationship does not exist as a matter of law, evidence must be clear and convincing so that it unequivocally and unmistakably provides the base for raising a constructive trust. *Ray v. Winter.*

The question of whether the evidence in this case establishes

clearly and convincingly that Sims occupied a fiduciary relationship to Christine at the time he purchased the THI stock was one of fact for determination by the trial judge who heard the testimony and observed the witnesses. Following long-established principles, this court will not reverse the trial court's findings unless they are contrary to the manifest weight of the evidence or palpably erroneous.

In support of their position, plaintiffs have cited many instances during the period of their marriage in which Sims executed financial transactions on behalf of himself and Christine. Since the constructive trust is normally proved by establishing facts showing an antecedent relationship which gives rise to the trust and confidence reposed in another (*Ray v. Winter*), we believe the evidence regarding events subsequent to the THI transaction is of relatively little importance here. In examining the evidence to determine the extent to which Christine entrusted the handling of her affairs to her husband we find ample support for the trial court's finding that neither dominated the other, and that Christine did not put full trust and confidence in Sims to manage her assets, but rather discussed financial matters with him regularly and shared financial decision-making with him. Accordingly, we find that the evidence supports the trial court's finding of no fiduciary relationship with respect to the THI transfer.

## IV

Plaintiffs next contend that the trial court erred in failing to find a violation of Illinois and Indiana securities laws in connection with the THI stock transactions. The relevant portion of the Indiana statute provides:

> "Prohibited practices with respect to sales and purchases. It is unlawful for any person in connection with the offer, sale or purchase of any security, either directly or indirectly, *** (2) to make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made in light of circumstances under which they are made, not misleading, ***." (Ind. Code sec. 23—2—1—12 (1972).)

Section 12(G) of the Illinois Securities Law of 1953 similarly provides:

> "It shall be a violation of the provisions of this Act for any person:
>
> * * *
>
> G. To obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Ill. Rev. Stat. 1979, ch. 121½, par. 137.12(G).

Under the remedial provisions of these statutes every sale of a security made in violation of the proscriptions of the statutes may be voidable at the election of the purchaser, exercised pursuant to statutory provisions. (Ind. Code sec. 23—2—1—19 (1982 Supp.); Ill. Rev. Stat. 1979, ch. 121½, par. 137.13; see *Kelsey v. Nagy* (1980), ____ Ind. App. ____, 410 N.E.2d 1333; *Norville v. Alton Bigtop Restaurant, Inc.* (1974), 22 Ill. App. 3d 273, 317 N.E.2d 384.

Plaintiffs contend that Sims clearly failed to state material facts in connection with the purchase or sale of a security, as those terms are defined in both statutes (Ind. Code sec. 23—2—1—1 (1982 Supp.); Ill. Rev. Stat. 1979, ch. 121½, pars. 137.2—1 and 137.2—5), and therefore that the trial court should have granted a rescission of the THI transactions and other appropriate remedies, including the awarding of attorney fees and costs.

Sims argues, *inter alia*, that plaintiffs may not invoke the civil remedies of the securities laws with respect to the THI stock transactions because Christine was not a "purchaser" as contemplated by the Indiana and Illinois statutes in question. (Ind. Code sec. 23—2—1—19 (1982 Supp.); Ill. Rev. Stat. 1979, ch. 121½, par. 137.13.) In essence, Sims challenges Christine's standing under the State securities laws.

Sims' contention is based on the rule stated in *Gowdy v. Richter* (1974), 20 Ill. App. 3d 514, 314 N.E.2d 549. In this case a wife sought to rescind a sale of unregistered securities made in violation of the Securities Act. (Ill. Rev. Stat. 1967, ch. 121½, pars. 137.13(A) and (B).) The transaction constituting the sale of the securities was conducted at a meeting between her husband and defendant. Following the sale, pursuant to the husband's directions, the defendant issued the stock certificate in the name of the husband and the wife as joint tenants. The wife testified that all the funds making up the purchase price were derived from three sources: her father, her husband's brother, and a bank loan obtained by increasing the mortgage on the family residence, which was held in joint tenancy. She also testified that she had participated in raising the funds and that she considered herself to be a joint owner of the stock. Nonetheless, the court held that the wife was not a "purchaser" as contemplated under the Securities Act for purposes of proceeding under the statute. The court defined the term "purchaser" as "a party to a transaction wherein he assumes ownership in exchange for valuable consideration" (20 Ill. App. 3d 514, 522, 314 N.E.2d 549, 555), and observed that since the wife was outside the actual contract negotiations for the purchase of the stock, her role was at best one of "financier" with respect to the transaction, despite the fact that she owned a one-half interest in the property. The court noted, however, that "a financing party may assume a variety of legal roles with regard to the benefited party, such

as *donor, lender, or beneficiary of a resulting trust,* that have no relationship whatever to the agreement between the contracting parties." (Emphasis added.) 20 Ill. App. 3d 514, 522, 314 N.E.2d 549, 555.

Although we recognize that the provisions of these securities statutes are to be liberally construed (*Norville v. Alton Bigtop Restaurant, Inc.* (1974), 22 Ill. App. 3d 273, 317 N.E.2d 384), we do not believe that under the facts and circumstances here Christine was a "purchaser" with respect to the THI stock transactions. There was considerable evidence establishing that the plaintiffs provided financing with regard to THI, and indeed we have recognized the existence of a resulting trust in favor of Christine in a one-half interest in 4,500 shares of the THI stock. We believe that the rule of *Gowdy v. Richter* is particularly appropriate here, and conclude that as between the parties, only Sims was a purchaser with attendant rights of rescission under the statutes. Accordingly, we will not reverse the trial court's denial of plaintiffs' claim under the securities statutes with respect to the THI transactions.

## V

We now turn to plaintiffs' claims of error which deal with various findings of fact and conclusions of law relating to the 186 shares of Zack Company stock acquired by Sims in 1973. As with the THI stock, plaintiffs contend that the evidence at trial overwhelmingly supported the finding that plaintiffs were entitled to the 186 shares upon the theories of constructive trust, resulting trust and redress of securities laws violations. Plaintiffs also claim alternatively that Mrs. Zack was entitled to rescind the sale of these shares on the theory of duress.

With respect to plaintiffs' resulting trust claim, we have examined the record with reference to the intention of the parties, the burden of proof with respect thereto, the quantum of evidence required and the amount of evidence to rebut a resulting trust, and we do not find that the trial court's finding of no resulting trust is contrary to the manifest weight of the evidence. The trial court found that Christine intended Sims to be the sole beneficial owner of the 186 shares. The evidence was contradictory and rested largely on the assessment of witness credibility, which in our opinion should not be overruled.

Similarly, with reference to the trial court's failure to impose a constructive trust based on actual fraud or abuse of confidential relationship, we do not believe that the trial court's findings are contrary to the manifest weight of the evidence.

The crux of plaintiffs' fraud claim was that Sims was able to purchase the 186 shares of Zack Company stock as as result of misrepresentations to Christine that she would have an ownership interest in

those shares. Sims testified, to the contrary, that Christine understood that he would be the sole owner of the stock. The trial court concluded that Sims' testimony was credible, and that the pledge of Christine's stock to facilitate the bank loan in question was not based on any representation that she would be an equitable owner. Moreover, it was established that as a result of Christine's actions she was ensured of becoming trustee and income beneficiary of the residuary trust, entitled to an annual income of $40,000 to $50,000 per year. The trial court concluded that the above consideration to Christine was a key component of the transaction. We do not find these findings to be against the manifest weight of the evidence.

Although plaintiffs point to evidence showing that Sims, on one occasion, signed Christine's name to a renewal of the bank loan, we do not believe such evidence clearly establishes plaintiffs' claim of misrepresentation in view of the record. It was undisputed that Christine had tendered to Sims an executed power of attorney with respect to the 200 pledged shares. In addition, Christine testified that had she been asked to sign the renewal note she would have done so, and had she known at the time that Sims had signed it, she would not have considered his actions to be forgery. Under the circumstances we feel the trial court was justified in concluding that Sims had authority to sign his wife's name. Accordingly, we will not reverse the court's findings with respect to the alleged fraud.

We have also examined plaintiffs' claim that Sims abused a fiduciary relationship with Christine in his acquisition and financing of the 186 shares of Zack Company stock. Plaintiffs cite many facts in evidence which they contend illustrate the manner in which Sims was benefited at the expense of Christine. Plaintiffs argue, *inter alia*, that Sims was able to purchase the stock at "greatly below book value" and as a result Christine was deprived of the full value of the stock which she might eventually inherit. Sims contends that this claim converts a contingent expectancy into a certainty since Christine would inherit the proceeds from the sale of stock only if her mother predeceased her, assuming the trust was still in existence at such time. Sims also points to evidence that Mrs. Zack had previously tried to find a buyer without success; that he was not anxious to buy the stock; and that Mrs. Zack set the purchase price and terms with the advice and counsel of Howard and attorney Gatenbey.

We have examined the above and other examples of Sims' alleged abuse of fiduciary duty and conclude that plaintiffs have not shown by clear and convincing evidence that Sims was unjustly enriched by either fraudulent acts or the abuse of a confidential relationship. Contrary to the contention of plaintiffs here, we believe that the evidence showed that Sims and Christine were mutually benefited by the trans-

action as evidenced by the benefits derived by Christine as income beneficiary and trustee of the residuary trust. Accordingly, we will not upset the trial court's refusal to impose a constructive trust with respect to the 186 shares.

## VI

Plaintiffs have also argued that Sims' purchase of the 186 shares should have been rescinded because of his violation of. Illinois securities laws, both with respect to Christine and Mrs. Zack. Ill. Rev. Stat. 1979, ch. 121½, pars. 137.12(F), (G), and (I).

In examining Christine's claim, we are of the opinion that she was properly denied relief under the securities laws. Initially, we note that plaintiffs have argued that Sims' "action and omissions" constituted an unlawful scheme. However, plaintiffs, in their brief, refer us to no particular actions or omissions to support this conclusory statement. Under the rule that points not argued are deemed waived, we do not believe this argument has been adequately presented for review here. (73 Ill. 2d R. 341(e)(7).) Moreover, we find that the rule of *Gowdy v. Richter* (1974), 20 Ill. App. 3d 514, 314 N.E.2d 549, as discussed above with reference to the THI transactions, is equally applicable to deny Christine standing with respect to the sale of the 186 shares.

We also point out that relief under the Illinois Securities Law is wholly statutory in nature and the only civil remedy provided for by section 13 is actual rescission of the sale of the securities. (Ill. Rev. Stat. 1979, ch. 121½, par. 137.13; *Shofstall v. Allied Van Lines, Inc.* (N.D. Ill. 1978), 455 F. Supp. 351.) Thus, even assuming that Christine's agreement to co-sign the bank loan and her pledge of her 200 shares of Zack Company stock as collateral for the loan are to be treated as a "sale or purchase of a security" so as to bring such transactions within the ambit of the securities laws (see, *e.g., Rubin v. United States* (1981), 449 U.S. 424, 66 L. Ed. 2d 633, 101 S. Ct. 698 (the pledging of shares of stock to obtain a bank loan was held to be a disposition of an interest in a security for value under section 17(a) of the Securities Act of 1933 (15 U.S.C. sec. 779(a) (1976))), her sole civil remedy under the Illinois statute would appear to be rescission of *these* transactions only. Plaintiffs, however, have not pursued this remedy here, and we need not consider its merits.

## VII

As to Mrs. Zack's claim that rescission was mandated under the Illinois Securities Law, or alternatively under her theory of duress, we cannot say that the trial court's determination of these issues was contrary to the manifest weight of the evidence.

Addressing briefly Mrs. Zack's duress claim, we note that in

order to invalidate an agreement on the basis of duress, a party must show that she was induced by a wrongful act or threat of another to execute a contract under circumstances which deprived the party of the exercise of her free will. (*Harris v. Flack* (1919), 289 Ill. 222, 124 N.E. 377; *Higgins v. Brunswick Corp.* (1979), 76 Ill. App. 3d 273, 395 N.E.2d 81.) Generally, the issue of duress is one of fact to be judged in light of the circumstances surrounding a given transaction. (*Higgins v. Brunswick Corp.*) In the instant case plaintiffs contend that Mrs. Zack disposed of the 186 shares of Zack Company stock, at a price considerably less than book value, only because Sims isolated her from her only child and grandchildren. However, Mrs. Zack failed to testify in support of her claim and the court concluded that her absence was not adequately explained. An unfavorable evidentiary presumption may arise if a party, without reasonable excuse, fails to produce evidence which is under her control. (*Fuery v. Rego Co.* (1979), 71 Ill. App. 3d 739, 390 N.E.2d 97; *Dollison v. Chicago, Rock Island & Pacific R.R. Co.* (1976), 42 Ill. App. 3d 267, 355 N.E.2d 588.) Here, the trial court had no opportunity to hear Mrs. Zack's explanation of the events surrounding the sale of the stock, no opportunity to evaluate her credibility, and no opportunity to observe her in person to determine whether she was the type of person who could have been forced against her will to relinquish her interest in the family business under these circumstances. The trial court was left to evaluate the issue of duress solely on the basis of circumstantial evidence and the conflicting testimony of other witnesses. This evidence showed, however, that Mrs. Zack, at the brink of retirement age, had tried, unsuccessfully, to sell the stock prior to her offer to Sims in 1971. From such evidence and in view of her failure to testify, the court could have reasonably inferred that Mrs. Zack might have executed the transaction notwithstanding any inducement regarding her grandchildren.

On this record we feel that the court's findings that the purchase was a voluntary arms-length transaction at a price set by the seller with the advice of her financial advisor, and with full knowledge that Sims was to be the sole owner, were not contrary to the manifest weight of the evidence.

## VIII

Next, we have examined plaintiffs' contentions that the trial court erred in refusing to enter judgment in favor of Christine for money allegedly appropriated from her, and for assets accumulated by Sims with his Zack Company and THI income. We find that many of these claims are repetitious and their factual bases have been considered elsewhere in this opinion. As we have previously stated, we consider

the $50,000 loan and the $100,000 loan to be yet due and owing to Christine. In examining plaintiffs' several remaining contentions here, we are ever mindful of the yet to be resolved disposition of these assets under the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 503), as noted earlier in this opinion. In any event, except as previously held, we do not find the trial court's determination of these issues to be contrary to the manifest weight of the evidence.

## IX

We are next asked to review the trial court's refusal to accord relief on derivative claims, brought by Christine on behalf of Zack Company and THI against Sims, for alleged acts of corporate waste and mismanagement. Initially, we find that Christine has standing to bring these claims as a shareholder of Zack Company, and as beneficial owner of one-half of the 4,500 shares of THI. *Galler v. Galler* (1975), 61 Ill. 2d 464, 336 N.E.2d 886.

The instant dispute involves Sims' compensation as president of Zack Company for 1974 and 1975, and his compensation as president of THI for the fiscal years 1974, 1975, 1977 and 1978. Also contested is Sims' use of two corporate aircraft owned by the respective companies as well as other assets.

According to plaintiffs, the amounts paid to Sims during the period in question were in excess of the fair value of any services rendered by him. In support of their derivative claim plaintiffs generally cite *Galler v. Galler.* We do not find this case entirely dispositive of the situation presented here. *Galler* considered the salaries of defendants, in a family corporation, which clearly exceeded that authorized by a shareholder's agreement. No such agreement has been presented here. In fact, in the case of Zack Company, the compensation at issue was approved by a unanimous resolution of the board of directors. This resolution authorized Sims a salary of $50,000 annually, and a profit-sharing bonus of 20% of profits before income taxes. Plaintiffs have not contended that the disputed compensation was not authorized either by the bylaws or any resolution of the boards of the two companies. Moreover, we are not convinced that the "fair value of services" necessarily is, or should be, the scale upon which to measure compensation of family shareholders in a closely held corporation such as the one at bar. In any case we think a noteworthy aspect of *Galler* is the great deference afforded by the reviewing court to the findings and conclusions of the trier of fact, especially on issues of credibility of the witnesses.

In the instant case the evidence consisted largely of contradictory testimony of the several witnesses. The trial court evaluated

the credibility of the witnesses and the weight of their testimony. We believe that on the whole the record supports the trial court's determination that Sims' compensation was not excessive under the circumstances, and that plaintiffs have not proved their claims of excessive compensation or corporate waste.

## X

Finally, plaintiffs urge reversal arguing that the trial court committed errors at trial in admitting and excluding certain evidence, and in limiting discovery.

First, plaintiffs argue that Sims' testimony was inconsistent and misleading and should have been disregarded as a matter of law. (*Chance v. Kimbrell* (1941), 376 Ill. 615, 35 N.E.2d 48.) We have examined the examples of Sims' testimony cited by plaintiffs in their brief. We find that the complained-of testimony relates solely to the matters of funding and ownership of THI. Since we have resolved these issues in favor of plaintiffs by the imposition of a resulting trust in the THI stock, we feel that plaintiffs have shown no prejudice, and we need not comment further on the credibility issues raised herein.

■■ Next, plaintiffs contend that the trial court erred in refusing to order Sims to answer an interrogatory concerning his net worth as of December 15, 1976. The trial judge has wide discretion in the control of discovery (*Cohn v. Board of Education* (1970), 118 Ill. App. 2d 453, 254 N.E.2d 803), and a reviewing court will not interfere with a trial court's ruling on discovery matters unless there is manifest abuse of discretion. (*Dobbs v. Safeway Insurance Co.* (1978), 66 Ill. App. 3d 400, 384 N.E.2d 34.) Under Supreme Court Rule 201(a), the duplication of discovery methods to obtain the same information should avoided. (73 Ill. 2d R. 201(a).) Here, plaintiffs requested the same information from defendants by means of deposition and by the production of documents. In addition, the court permitted an *in camera* inspection of Sims' tax returns for the years in question. In light of the above, we find no manifest abuse of discretion by the trial .court.

Plaintiffs next argue that the trial court erred in excluding certain evidence explaining Mrs. Zack's failure to testify at trial and then raising an inference from her failure to testify. During trial Christine sought to testify about the poor condition of her mother's health to explain why she could not testify as a witness at trial. The trial court excluded some of this testimony and then later found that no competent or credible explanation was given for Mrs. Zack's failure to testify.

Specifically, plaintiffs offered rebuttal testimony of Christine that Mrs. Zack was 77 years old and in poor health. She suffered from dia-

betes, for which she took two insulin injections daily, and experienced "complications inherent with diabetes." She testified that Mrs. Zack had peripheral neuritis and back problems which a doctor thought might be the result of an unspecified nerve problem or a possibly ruptured disc. She had "retinal hemorrhages" and only partial vision in the right eye. In addition, she had memory lapses which were becoming more pronounced and of longer duration. Christine offered the opinion that a doctor would "probably diagnose" it as senility.

Defendants' counsel objected to Christine's conclusions and medical opinions on the grounds that they were self-serving and beyond her qualifications to render medical opinions. The court struck the conclusion that Mrs. Zack's health was "poor," and the testimony that Mrs. Zack had "complications that accompany diabetes," "hand in glove syndrome," and "the possibility of a ruptured disc." The remaining testimony was allowed.

Where an adverse presumption might arise from a party's failure to call a witness at trial, that party is entitled to explain why the witness is unable to testify. (*Warth v. Loewenstein & Sons* (1905), 219 Ill. 222, 76 N.E. 379.) If there is a plausible explanation for a party not testifying, or if a party is not a competent witness, no unfavorable presumption is warranted. (*In re Estate of McVicker* (1963), 39 Ill. App. 2d 389, 188 N.E.2d 731.) It remains, however, within the province of the trial court to determine if such a plausible explanation has been proved by credible and competent evidence.

Here, there was no evidence that Mrs. Zack was not competent to testify. Plaintiffs rather contend that Christine's personal observations constituted competent evidence of Mrs. Zack's poor health, which explained her inability to testify. On the basis of the evidence the trial court was not persuaded that Mrs. Zack was unable to testify due to her disabilities. The court's determination rested in part on assessment of Christine's credibility, and we will not reverse its determination on that issue. Plaintiffs here were not foreclosed from offering competent medical testimony to explain Mrs. Zack's inability to testify but none was offered. We feel that under these circumstances the trial court was under no obligation to accept Christine's explanation of Mrs. Zack's failure to testify.

We have considered the plaintiffs' final contentions of error with respect to the trial court's exclusion and admission of certain evidence. The determination as to the admissibility of evidence rests primarily in the discretion of the trial court and its decision will be reversed only where that discretion has clearly been abused. (*Country Mutual Insurance Co. v. Adams* (1980), 85 Ill. App. 3d 501, 407 N.E.2d 103.) After reviewing the relevant evidence, we find no clear abuse of discretion in the evidentiary rulings at issue.

### XI

Accordingly, paragraphs 17 and 50 of the findings by the circuit court are modified as herein set forth; the judgment is modified (a) to impose a resulting trust in favor of Christine as to a one-half interest in the 4,500 shares of THI held by Sims, and to order Sims to transfer and deliver to Christine her interest therein, namely, 2,250 shares; and (b) to enter judgment in favor of Christine and against Sims in the amount of $168,825.25. The judgment of the circuit court as hereby modified is affirmed.

Modified in part; affirmed as modified.

LORENZ and WILSON, JJ., concur.

### Supplemental Opinion on Denial of Rehearing

JUSTICE MEJDA delivered the opinion of the court:

Plaintiffs have filed a petition for rehearing contending that the money judgment awarded herein should be further modified to include interest on two unpaid loans, computed to the date of judgment. The subject loans are the $50,000 loan made by Christine to Sims in 1968 and the $100,000 loan made by her to Sims in 1970.

We have carefully reviewed the relevant portions of the record, and we find that the evidence presented does not support the claim for additional interest on these two loans. Plaintiffs refer us to no facts or evidence in the record, other than Sims' general statement that he owed these loans "and accrued interest," which would indicate that Christine is entitled interest beyond the $18,825.25 accruing on the amount loaned to Sims for the purpose of investment in THI. With respect to the $100,000 loan, the fact that Sims loaned this amount to THI at an interest rate of prime plus 1/4% does not require us to fix the rate of interest payable on the note from Sims to Christine at the same rate. These were separate transactions between separate parties. The note evidencing the subject loan was not produced at trial, nor does the record disclose the existence of any terms requiring the payment of interest on this note.

There being no evidence to support the claim for interest beyond that awarded in our modified judgment, we adhere to our original opinion. Accordingly, the plaintiffs' petition for rehearing is denied.

LORENZ and WILSON, JJ., concur.