GRACE EVANGELICAL LUTHERAN CHURCH OF RIVER FOREST, ILLINOIS, Plaintiff-Appellee and Cross-Appellant, *v.* THE LUTHERAN CHURCH—MISSOURI SYNOD *et al.*, Defendants-Appellants and Cross-Appellees.

First District (4th Division) No. 81—1851

Opinion filed September 8, 1983.—Rehearing denied October 17, 1983.

Wesley S. Walton and Ward A. Meythaler, both of Chicago (Keck, Mahin & Cate, of counsel), for appellants.

Edward T. Joyce and Richard S. Reizen, both of Chicago (Joyce and Kubasiak, P.C., of counsel), for intervenors-appellants Wilbur Werling, Carl Driessnack, Loren Saar, and Henry Eickelberg.

James A. Serritella, James A. Klenk, and Donald A. Vogelsang, all of Chicago (Reuben & Proctor, of counsel), for appellee.

PRESIDING JUSTICE ROMITI delivered the opinion of the court:

This is an appeal by all parties from an order of the circuit court of Cook County declaring an option agreement to be valid and legally binding, but also declaring that a particular provision of that option agreement was unenforceable at law because such enforcement would necessitate an impermissible intrusion by the court into matters of religious doctrine and polity.

We affirm.

Appellant and cross-appellee, the Lutheran Church—Missouri Synod (the Synod), a Missouri not-for-profit corporation, is the second

largest Lutheran church body in North America. Appellant and cross-appellee, Concordia Teachers College, is an Illinois not-for-profit corporation located in River Forest. Concordia is owned and maintained by the Synod. (All further references to positions taken by the Synod in this appeal also apply to Concordia.) Appellee and cross-appellant, Grace Evangelical Lutheran Church of River Forest, Illinois (Grace), is an incorporated congregation with approximately 1700 members. Intervenors Wilbur Werling, Carl Driessnack, Loren Saar, and Henry Eickelberg, who are appellants and cross-appellees in this appeal, represent a group of Grace members who disagree with certain actions undertaken by Grace.

Grace was incorporated in 1902 and became a member of the Synod in 1903. In 1929, Grace purchased from the Synod the property which is the subject of this dispute, about one acre of land located on Concordia's campus. On that land Grace's present church structure was built. The property was conveyed pursuant to an agreement, signed by Grace, Concordia, and the Synod, granting the Synod and Concordia a 99-year option to repurchase the property upon the happening of any one of three events:

(A) Whenever Grace sought to sell the property and received a *bona fide* offer from a *bona fide* purchaser, the Synod had the right to purchase the property at that price. If the price was not agreeable to the Synod and they could not agree with Grace on a price within 20 days, then three "appraisers" would be selected (one by Grace, one by the Synod, and the third by the first two appraisers) to determine the price and terms. The results of this "arbitration" were to be accepted within 20 days. The Synod was also required to exercise its option under this clause within 40 days of receiving notice from Grace of the receipt of a purchase offer;

(B) Whenever Grace decided to affiliate, consolidate or merge with any other corporation, association or organization not affiliated with the Synod;

(C) "Whenever [Grace] shall fail or decide to not teach and preach the scriptures as set forth under Article II entitled 'Confession' of the Constitution of said Missouri Synod and in accordance with the rules, regulations and customs of [the Synod]." (The "Confession" states that the Synod and its members accept without reservation the Bible as the only rule and norm of faith and practice and certain other religious writing as the "true and unadulterated statement and exposition of the Word of God.")

The agreement also provided that upon the happening of either of the latter two events the Synod or Concordia had the option of repurchasing the property with its improvements. If a price could not be agreed on within 30 days then the price was to be "arbitrated" within 60 days by three men selected in the same manner as was provided for under paragraph A. Their findings were to be accepted within 10 days. The agreement further stated that failure to exercise the option "within the time specified" would relieve Grace of all obligations under the agreement and render it null and void.

Grace purchased the property for $20,000. Five thousand dollars was paid in cash and the remaining amount was paid over a period of years, with some of that money allocated from money Grace had collected from its congregation for Synod purposes.

In the 1970's certain controversies within the Synod caused Grace to re-evaluate its position in that body. One of these controversies concerned a resolution passed at the Synod's 1973 convention, declaring that certain members of the faculty of Concordia Seminary in Saint Louis were teaching false doctrine. Grace had opposed this resolution. Most of the faculty and many of the students of the seminary left it to form a school called Seminary in Exile, or Seminex.

On June 13, 1976, Grace ordained as assistant pastor Aaron Sorrels, a graduate of Seminex who had not been certified by the Synod as required under Synod rules. The Synod and Concordia had opposed his ordination because of this lack of certification; however, there were continuing efforts by the parties to reconcile their differences on this issue before and after the ordination.

On August 24, 1977, Grace's church council recommended to the congregation that Grace withdraw from the Synod. On September 20, 1977, the Voters' Assembly of Grace voted to accept this recommendation effective October 1, 1977. On the latter date the Synod and Concordia notified Grace that they were exercising their option to repurchase the property.

On October 28, 1977, Grace filed a complaint for declaratory judgment, seeking a declaration that the option agreement was unenforceable under the first amendment and under principles of contract law. The Synod and Concordia filed an answer and counterclaim in which they sought a declaration that they were entitled to repurchase the property pursuant to paragraph C of the option agreement. Intervenors were permitted to file a complaint for injunction and other relief in which they raised certain procedural objections to the vote taken by Grace. (They have abandoned these contentions on appeal.)

After the filing of Grace's complaint the Synod asked its commis-

sion of adjudication to resolve this dispute. Under Synod rules that body had jurisdiction in resolving disputes involving the Synod as a party. Grace did not participate in the ensuing proceedings, having advised the Synod that because of Grace's withdrawal from the Synod it did not believe the Synod's adjudicatory bodies had jurisdiction and that in any event such an adjudication would not even be binding on the Synod's member congregations because of their autonomy. On June 12, 1978, the Synod commission of adjudication rendered a decision holding that Grace had violated the rules, regulations and customs of the Synod and therefore the Synod was entitled to exercise the option.

Intervenors sought an adjudication before a Synod district commission of adjudication, the body having jurisdiction over disputes among members of a particular district of the Synod. Grace also declined to participate in these proceedings. On August 7, 1978, that body determined that Grace had acted contrary to the scriptures in various respects and that as a consequence a schism was created in the congregation. In an addendum issued April 30, 1979, the district commission also found that members of Grace who had opposed Grace's actions were entitled to the church property by virtue of article XV of the constitution and bylaws of Grace, which stated:

> "If at any time a schism should take place in the congregation which God may graciously prevent, the property of the congregation and all benefit connected therewith shall remain with those members who shall adhere to the unalterable articles of this constitution *** ."

In various pleadings before the trial court the Synod and intervenors also contended that these findings were binding on the courts.

At the close of discovery Grace and the Synod each moved for summary judgment. Acting on these motions and on intervenors' motion that the court adopt the findings of the district commission of adjudication, the trial court issued its order, holding that the option agreement was valid and legally binding on the parties but the provisions of paragraph C could not be enforced by a civil court because of first amendment restrictions.

 Although the State has a legitimate interest in providing a forum for the peaceful resolution of church property disputes, the civil court's role is severely circumscribed by the first amendment and accordingly the courts may not resolve such disputes on the basis of religious doctrine and practice. (*Jones v. Wolf* (1979), 443 U.S. 595, 61 L. Ed. 2d 775, 99 S. Ct. 3020; *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*

(1969), 393 U.S. 440, 21 L. Ed. 2d 658, 89 S. Ct. 601.) When those matters are at issue in a property dispute involving a hierarchical church organization, the civil court must defer to any resolution of those issues reached by the highest authority within that church organization. (*Jones v. Wolf* (1979), 443 U.S. 595, 61 L. Ed. 2d 775, 99 S. Ct. 3020; *Serbian Eastern Orthodox Diocese v. Milivojevich* (1976), 426 U.S. 696, 49 L. Ed. 2d 151, 96 S. Ct. 2372.) However so long as no consideration of doctrine is involved the States are free to adopt any one of various approaches for settling church property disputes. (*Jones v. Wolf* (1979), 443 U.S. 595, 61 L. Ed. 2d 775, 99 S. Ct. 3020.) One such method, specifically approved by the court in *Jones*, is the neutral principles of law approach in which a court determines property ownership by applying general principles of property law and examining the terms of the local church charters, State statutes governing the holding of church property, and other pertinent documents such as provisions in the constitution of the general church pertaining to the ownership and control of church property. Again, however, if the church documents expressly incorporate religious concepts in the provisions relating to the ownership of property so that interpretation of those documents will require the court to resolve a religious controversy, then the court must defer to the resolution of those issues by the authoritative ecclesiastical body, assuming that the polity of the church is easily determined without intrusive scrutiny by the court. *Jones v. Wolf* (1979), 443 U.S. 595, 61 L. Ed. 2d 775, 99 S. Ct. 3020; *Serbian Eastern Orthodox Diocese v. Milivojevich* (1976), 426 U.S. 696, 49 L. Ed. 2d 151, 96 S. Ct. 2372; *Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.* (1970), 396 U.S. 367, 24 L. Ed. 582, 90 S. Ct. 499, (Brennan, J., concurring).

In accordance with these principles of law we first consider the contentions of the parties which purportedly involve only the application of neutral principles of law to the resolution of this dispute.

■■ A number of the Synod's contentions on appeal depend upon the premise that it is entitled to exercise the option upon a finding that Grace violated the rules, regulations, and customs of the Synod. We need not examine these contentions in detail because we find that premise to be contrary to our construction of the pertinent option provision, paragraph C. The Synod apparently contends that this clause means that the option can be invoked if Grace violates the Synod's secular rules and customs without the necessity of establishing any deviation from the Synod's religious precepts. However we find that under a plain reading of the option provision it is subject to be-

ing exercised only if the *teaching and preaching of the scriptures* at Grace was not in accordance with the rules and regulations of the Synod. Thus a finding that Grace violated the rules and customs of the Synod without regard to the impact of those violations on Grace's adherence to the Synod's doctrinal positions would not suffice to permit exercise of the option. It is also clear, as the trial court found, that in deference to the first amendment the courts cannot resolve the question of whether the scriptures are being preached and taught in accordance with certain doctrinal positions. *Jones v. Wolf* (1979), 443 U.S. 595, 61 L. Ed. 2d 775, 99 S. Ct. 3020; *Eddy ex rel. Pfeifer v. Christian Science Board of Directors* (1978), 62 Ill. App. 3d 918, 379 N.E.2d 653.

■ The Synod contends that independent of the option contract between the parties, the trial court should have found that either a resulting trust or a constructive trust was established in favor of the Synod and Concordia. Generally a resulting trust arises when one person buys property with his own funds and title is taken in the name of another. (*In re Estate of Wilson* (1980), 81 Ill. 2d 349, 410 N.E.2d 23.) In this cause it is undisputed that Grace ultimately furnished the consideration for the property. Although the Synod initially loaned Grace a substantial portion of the cash used to purchase the property, that loan was repaid in full by Grace. A resulting trust does not arise where the funds furnished by a third party are in the form of a loan. *Fields v. Fields* (1953), 415 Ill. 324, 114 N.E.2d 402; *Zack Co. v. Sims* (1982), 108 Ill. App. 3d 16, 438 N.E.2d 663.

■ Nor do we find persuasive the Synod's contention that a constructive trust should be imposed. A constructive trust may be imposed whenever it is established that one person holds property which in equity and good conscience should be possessed by another. (*Zack Co. v. Sims* (1982), 108 Ill. App. 3d 16, 438 N.E.2d 663; *Steinmetz v. Kern* (1941), 375 Ill. 616, 32 N.E.2d 151.) But in this cause for the trial court or this court to impose such a trust would require precisely the kind of searching inquiry into religious doctrine which the courts are forbidden to undertake. Fundamentally, the Synod's equitable arguments in favor of imposing such a trust are grounded in the contention that Grace was not justified in withdrawing from the Synod. But such a determination would involve the searching evaluation of matters of doctrine and church practice that this court cannot make.

In its cross-appeal Grace had contended that as a matter of law the option agreement is unenforceable because it contains no definite price term and because its provisions relating to arbitration of the price are void and, in any event, uncertain. Grace also contends that

the Synod and Concordia failed to seek to exercise the option within a reasonable time and therefore the option is void by its own terms. On these grounds Grace seeks reversal of the trial court's order insofar as it declared the option to be valid and binding.

■ The Synod concedes that the option does not contain a specific price for the property. But they note that it does contain provisions for ascertaining that price. As we have set out earlier in this opinion, upon the exercise of the option, price disagreements were to be resolved by the appraisers in a process that was referred to in the option contract as arbitration. Grace relies on the fact that until the adoption of the Uniform Arbitration Act (Ill. Rev. Stat. 1981, ch. 10, par. 101 *et seq.*), in 1961, agreements to arbitrate future disputes were not valid in Illinois, in accord with the common law rule. (*Cocalis v. Nazlides* (1923), 308 Ill. 152, 139 N.E. 95; *Godare v. Sterling Steel Casting Co.* (1981), 96 Ill. App. 3d 601, 421 N.E.2d 925; Ill. Ann. Stat., ch. 10, par. 101, Introductory Notes, at 401 (Smith-Hurd 1975).) However this rule was not applicable to provisions concerning the valuation of property or other matters when that valuation was merely ancillary to a contract. (*Cocalis v. Nazlides* (1923), 308 Ill. 152, 139 N.E. 95; *Norton v. Gale* (1880), 95 Ill. 533.) The "arbitration" provision at issue here was not intended to resolve an ultimate legal issue such as the existence of grounds to permit exercise of the option, rather it was intended to establish the value of the property in the event the option was exercised. As such it was a valid provision despite common-law proscriptions concerning arbitration provisions pertaining to future disputes. *Hamilton v. Home Insurance Co.* (1890), 137 U.S. 370, 34 L. Ed. 708, 11 S. Ct. 133; 16 Williston on Contracts sec. 1918A (3rd ed. 1976).

■ Grace also contends that even if the use of arbitrators was valid, the option is invalid because it does not specify the standard to be used by them in arriving at a price. As we have noted the first clause, pertaining to a right of first refusal, specifically referred to the arbitrators as "appraisers." Although in a subsequent clause pertaining to the option exercise at issue here the arbitrators are referred to only as "men," it is clear that the use of appraisers was contemplated throughout. Numerous Illinois cases have approved similar terms as providing a sufficiently precise standard of determining price and accordingly we find no merit to Grace's objection on this ground. *Norton v. Gale* (1880), 95 Ill. 533; *Stose v. Heissler* (1887), 120 Ill. 433, 11 N.E.161; *Chicago Title & Trust Co. v. Northwestern University* (1976), 36 Ill. App. 3d 165, 344 N.E.2d 52.

■ Grace next contends that in any event the Synod did not ex-

ercise its option within a reasonable time and for that reason the option is void. Grace concedes that as to the exercise of the option based on paragraph C no specific time limit is specified. However Grace contends that implicit in the contract is a requirement that such exercise take place within a reasonable time. (*Yoder v. Rock Island Bank* (1977), 47 Ill. App. 3d 486, 362 N.E.2d 68.) Grace notes that although the Synod has cited the ordination of Aaron Sorrels as one of the ways in which Grace violated the terms of paragraph C, the Synod did not seek to exercise its option until more than 15 months after that ordination. The record establishes however that the precipitating event for the Synod was Grace's decision to withdraw from the Synod; the Synod notified Grace of its intentions on the very day Grace's decision became effective. After the ordination of Sorrels the record establishes that there were numerous efforts by the parties to reach a resolution of their disputes. Only when Grace ultimately decided to withdraw from the Synod did the Synod exercise its option. Under these circumstances we do not find that the lapse of time between the ordination and the Synod's ultimate decision was unreasonable. See *Yale Development Co. v. Aurora Pizza Hut, Inc.* (1981), 95 Ill. App. 3d 523, 420 N.E.2d 823.

Intervenors contend that irrespective of its policy the Synod's adjudications should have been enforced because under the law of voluntary associations courts must accept such associations' interpretations of their own rules. But in this cause the dispute itself involves the question of the division of authority within the Synod; whether the congregation or the governing authorities of the Synod are the ultimate arbiters of doctrinal divisions. Thus we are squarely presented with the question of the polity of the Synod.

As we have noted earlier, one method the courts may use to resolve church property disputes without becoming impermissibly involved in questions of religious doctrine and practice is to determine the polity of the church organization and to then defer to the authoritative determination of the conflict by the highest authority within that organization. All the parties to this appeal contend that this dispute may be resolved in this manner. Of course the parties do not agree about which body holds that authority. Nor do they even agree as to the nature of the determination made by one of those bodies, the Synod.

We are primarily concerned here with the distinction between congregational and hierarchical polities. A church with a congregational polity has been defined by the United States Supreme Court as one in which:

"*** the property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church governance is concerned, owes no fealty or obligation to any higher authority." (*Watson v. Jones* (1872), 80 U.S. (13 Wall.) 679, 722, 20 L. Ed. 666, 674.

One article on the subject has defined a congregational polity as one in which "each local congregation is self-governing [and] *** in which the autonomy of the local congregation is the central principle." (Note, *Judicial Intervention in Disputes Over the Use of Church Property*, 75 Harv. L. Rev. 1142, 1143-44 (1962).) A hierarchical church polity was defined in *Watson* as one:

"*** where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization." (*Watson v. Jones* (1872), 80 U.S. (13 Wall.) 679, 722-23,) (20 L. Ed. 666, 674.)

These are theoretical categories, however, and it has been recognized that it is possible for a church to constitute a combination of hierarchical and congregational aspect. (*Kelley v. Riverside Boulevard Independent Church of God* (1976), 44 Ill. App. 3d 673, 358 N.E.2d 696.) Thus in this cause the parties all agree that with respect to the ownership of property the Synod is congregational. Its rules provide that membership of a congregation in the Synod gives the Synod no equity in the congregation's property. However this aspect of the polity of the Synod is not dispositive in this property dispute because we are concerned with the alleged violation of a requirement of doctrinal purity and the question of who has the power to decide such issues within the church.

The Synod and intervenors contend that with respect to doctrine the polity of the Synod is hierarchical. On this ground the Synod contends that the trial court should have deferred to the determination of the Synod's commission of adjudication that Grace had deviated from the scriptures in its teaching and preaching. The Synod contends that based on this allegedly authoritative determination it was entitled to exercise the option. Intervenors also cite the determination of this commission but they rely on that part of the determination which found that because of these violations a schism had been created and the minority members of Grace were entitled to the property of the congregation. Thus intervenors seek to have themselves and those

they represent awarded the property. Presumably this would vitiate any need for the Synod to seek to exercise its option. However in oral argument the Synod has indicated that it seeks the right to exercise its option in derogation of the intervenors' claim.

It is Grace's contention that the Synod has a congregational polity and thus the courts should defer to Grace's determination that it continues to properly teach and preach the scriptures in conformity with the Synod's doctrine, rules, and practices.

Included in the record on appeal are the constitution and bylaws of the Synod and of Grace, histories of the Synod, minutes of Synod meetings, reference books on religious organizations in America and numerous other documents relating to this issue. Upon a review of all of this material we conclude that the polity of the Synod is not a readily ascertainable fact. We find that the trial court correctly concluded that an attempt to determine this fact would in this case necessarily involve the courts in "*** a searching and therefore impermissible inquiry into church polity." *Serbian Eastern Orthodox Diocese v. Milivojevich* (1976), 426 U.S. 696, 723, 49 L. Ed. 2d 151, 170, 96 S. Ct. 2372, 2387.

Our inability to readily (and thus constitutionally) determine the polity of the Synod is illustrated by the following examples from the evidence presented to the trial court and to us on appeal. The Synod presented the affidavit of Dr. Herbert Mueller, secretary of the Synod and also a member of the Synod's commission on constitutional matters, a body charged under Synod rules with interpreting the Synod's constitution and bylaws. Dr. Mueller avers that:

> "*** the Synod regards its member congregations as having voluntarily relinquished a portion of their autonomy by associating with other member congregations within the Synod, especially in doctrinal matters, in procedures involving the adjudication and appeal of doctrinal issues, and in its own rules, regulations, custom, and polity. In this respect the Synod regards itself as having hierarchical character, as that has been articulated by some civil courts."

However Dr. Mueller also concedes in the affidavit that he was not presenting the official position of the commission on constitutional matters. Grace presented the affidavit of Martin E. Marty, Fairfax M. Cone Distinguished Service Professor at the University of Chicago Divinity School, with a doctorate in American religious and intellectual history. Marty is a past president of the American Society of Church Historians and is an ordained Lutheran minister. Marty averred that upon a review of the Synod's constitution, bylaws, and history he had

concluded that:

> "*** the Lutheran Church - Missouri Synod is a religious denomination of congregational polity, that is to say that the majority of the voting members of a [Synod] congregation is the final arbiter of whether determinations of the Synod 'are in accordance with the Word of God or expedient as far as the condition of a congregation is concerned.' "

All the parties cite to various provisions of the bylaws and constitution of the Synod. Grace notes that article VII of the Synod's constitution provides:

> "In its relation to its members the Synod is not an ecclesiastical government exercising legislative or coercive powers, and with respect to the individual congregation's right of self-government it is but an advisory body. Accordingly, no resolution of the Synod imposing anything upon the individual congregation is of binding force if it is not in accordance with the Word of God or if it appears to be inexpedient as far as the condition of a congregation is concerned."

On the other hand the Synod and intervenors cite bylaws provisions permitting the Synod to suspend and expel members who act contrary to certain doctrinal statements (Synod Constitution, art. XIII) and establishing an elaborate procedural structure for adjudication and appeal of disputes within the Synod (By-Laws of the Synod, sec. V).

Grace cites the conclusion of Dr. Carl S. Mundinger, a Synod historian, that the Synod's constitution "made the congregation the possessor of all church power and the highest tribunal ***." (C. S. Mundinger, Government in the Missouri Synod 196 (1947).) But the Synod in turn notes that Mundinger stated that because of the Synod's supervisory powers over pastors and teachers it:

> "*** could exercise, and did exercise, control over the lives of all the pastors and teachers and over all the doctrine taught in the member churches. It is no exaggeration to say that this provision made it possible for an energetic President of Synod to determine what should be taught, how it should be taught, and who should do the teaching. Given the other provision of the constitution that all matters of doctrine and faith are to be decided by the Word of God and not by majority vote, the President of Synod could exercise influence over doctrine and life of both pastor and congregation altogether out of keeping with the commonly accepted concept of a strictly independent local congregation." Mundinger, at 187-88.

Upon review of such conflicting evidence and of the voluminous

documents contained in the record, we have found that we cannot constitutionally make the extensive inquiry and evaluation necessary to determine the polity of the Synod with respect to doctrinal disputes. The other neutral methods of resolving this dispute advanced by the parties have also not sufficed. Thus, although we have found no merit to Grace's contentions with respect to the legal invalidity of the option contract at issue, we have also determined that on the record before us we cannot constitutionally determine whether that option can be exercised.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

JIGANTI and LINN, JJ., concur.